Howard A. Levine, J.
In May, 1975, the two children who are the subject of the instant proceedings were adjudicated as neglected children and placed in the custody of the petitioner, Department of Social Services, for a period of 18 months. The respondents, parents of the children, were directed to co-operate and fully participate in a plan of rehabilitation involving various services set forth in a written letter to the court, dated May 13, 1975. This plan included attendance at a parent rehabilitation and enrichment program on a weekly basis and mental health counseling.
The instant proceedings were brought by the Department of Social Services to terminate the parental rights of the respondents on the ground of permanent neglect. The petitions allege that for a period of more than one year respondents have failed substantially, continuously and repeatedly to maintain contact with the children and have also so failed to plan for their children’s future, although financially and physically able to do so. The petitions further allege that the parents have continuously and repeatedly failed to co-operate with the petitioner in attempts to strengthen the parental relationship with the children and to follow the rehabilitative plan previously ordered by the court.
Respondents have moved to dismiss the petitions on the grounds that New York’s permanent neglect statute is unconstitutional for vagueness and infringement of respondents’ First Amendment rights of privacy and denies them equal protection of the laws.
*740 With respect to respondents’ attack on the facial validity of the statute for vagueness, the specific portion objected to is that which permits termination of parental rights on grounds of permanent neglect for respondents’ "failure to plan for the future of the child”. They point out that prior to the 1973 amendment to the statute (L 1973, ch 870), an adjudication of permanent neglect could not be made unless the petitioner proved a failure of the parents both to "keep in contact” and "plan” for the future of the child; that parental rights were safeguarded by reason of the definiteness of the "keep in contact” requirement which afforded sufficient notice of their obligations to avoid termination of parental rights. However, the 1973 amendment to the statute substituted "or” for "and” and this change from the conjunctive to the disjunctive, as interpreted by the Court of Appeals in Matter of Orlando F. (40 NY2d 103) permits an adjudication of permanent neglect solely on the basis of failure to plan, irrespective of the qualitative and quantitative substantiality of continued contacts with the child by the parents. It is respondents’ argument that the requirement to "plan” is fatally indefinite in failing to give parents adequate notice of what they must do to avoid losing parental rights and permitting arbitrary, capricious and discriminatory application by courts and social agencies.
The phrase in issue, "failure to plan for the future of the child”, was incorporated in the original enactment of New York’s permanent neglect statute in 1959. The purpose of the legislation clearly appears from the legislative history (see Governor’s memorandum of approval, NY Legis Ann, 1959, pp 415-416) and is extensively discussed in Gordon, Terminal Placements of Children and Permanent Termination of Parental Rights: the New York Permanent Neglect Statute (46 St. John’s L Rev 215). Until 1959, literally thousands of New York children remained in the limbo of foster care, neither restored to a permanent stable home with their biological parents nor freed for adoption, because their parents were unable or unwilling adequately to care for them and would not consent to their permanent placement in an adoptive home. Parental consent generally could only be dispensed with by proof of total abandonment. The strictness of the abandonment concept applied by the New York courts meant that parents who were unable or unwilling meaningfully to exercise parental rights could nevertheless forestall the per *741 manent placement of their child in a stable adoptive home. (See discussion, 46 St. John’s L Rev, p 230 et seq.) The deleterious effects of protracted foster care, in failing to satisfy basic developmental needs of children and burdening the State with the enormous cost of maintaining them has been well documented. (See id., pp 218-220.) The purpose of the original statute thus was to provide a means for freeing such children for adoption without the consent of their parents who insisted upon retaining formal ties to the child but were unwilling meaningfully to perform the obligations of parenthood through substantial and continual contact and planning for the child’s future. The purpose behind the 1973 amendment to the statute, permitting an adjudication of permanent neglect on the basis of either the failure to keep in contact or the failure to plan, is equally clear. The evils of protracted foster care are not avoided merely through substantial contacts with the child by the parents when they are unwilling to take the necessary steps within their power and ability to restore the child to their home. See the statement of the sponsor of the amendment, State Senator Joseph R. Pisani, Chairman of the Temporary State Commission on Child Welfare, quoted in Matter of Orlando F. (40 NY2d 103, 111, supra). Thus the duty to plan was made a separate and distinct obligation.
Applying the foregoing legislative history, the New York courts have had an opportunity to construe and apply the meaning of the "failure to plan” ground. It is a well-settled principle of constitutional law that an authoritative construction of a State statute by its courts must be considered and is binding in any attack on the statute for vagueness. (See Wainwright v Stone, 414 US 21; Broadrick v Oklahoma, 413 US 601; and Law Students Research Council v Wadmond, 401 US 154.) As so construed, the requirement of the parent to substantially plan means not only to formulate, but also to accomplish, a feasible and realistic plan to restore the child to a permanent, stable home with its parent. (See Matter of Stephen B., 60 Misc 2d 662; Matter of Orzo, 84 Misc 2d 482 and Matter of Orlando F., supra.) As stated in Orlando F. (40 NY2d at p 110) "to be sure, the mother has evinced a 'burning desire’ to regain custody of the child, but it is undisputed that in the three years preceding this litigation she failed to take the affirmative steps necessary to insure that Orlando would *742 be the rightful beneficiary of an adequate home life if returned to her.”[1]
As so construed, the statutory phrase in question more than adequately satisfies the constitutional requirement for definiteness under the due process clause. To make the "plan” provision as definite as the "keep in contact” one, which respondents suggest is necessary, would require a detailed recital of every conceivable program of personal, economic, residential and social rehabilitation that might tend to accomplish the goal of restoration of children to a wholesome, permanent home environment with their parents. Such a recital, if not impossible to accomplish, at the least would produce a statute of such complexity and prolixity that it would defeat the purposes of both practical implementation and fair notice to those affected. Such definiteness is not constitutionally required under the vagueness doctrine, as applied by the Supreme Court, even when dealing with statutes imposing criminal sanctions or restricting First Amendment rights of free expression or political activity. Thus, the court has upheld as sufficiently definite statutory prohibitions against "political activity” by governmental employees (Civil Serv. Comm. v Letter Carriers, 413 US 548 and Broadrick v Oklahoma, 413 US 601, supra); permitting discharge of Federal employees for "such cause as will promote the efficiency of [the] service” (Arnett v Kennedy, 416 US 134, 151-152); conditioning admission to the Bar upon an assessment of "the character and general fitness requisite for an attorney and counselor-at-law” (Law Students Research Council v Wadmond, supra, p 156); and authorizing a court martial for *743 "conduct unbecoming an officer and a gentleman” and for "disorders and neglects to the prejudice of good order and discipline in the armed forces.” (Parker v Levy, 417 US 733, 738.)[2]
As construed by New York’s courts the statute, in plain language, conveys to parents their duty to participate in the formulation of a program of action which will realistically tend to accomplish the desired goals of the statute, namely, the return of the child to their custody with adequate care on a permanent, stable basis. That mandate, in any particular case, will in all likelihood be tailored to the conditions of parental personality, economic status and home atmosphere which led to the placement of the child in foster care in the first instance. It will be further delineated through the implementation of the statutory mandate imposed upon the agency to make "diligent efforts to encourage and strengthen the parental relationship”. More cannot be required by way of definiteness without either restricting the scope of the legitimate State purpose underlying its enactment or, as previously described, making the statute totally unworkable. As stated by the United States Supreme Court in Colten v Kentucky (407 US 104, 110) "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.”
Moreover, it should be noted that in the instant case the "plan” required of the respondents was even more particularized and delineated by the order of disposition in the previous neglect proceeding at the time of placement of the children in foster care, wherein specific programs for the rehabilitation of the family unit were set forth. The petition in the instant *744 proceeding alleges a total failure of the respondents to follow through on that "plan”. Thus, these respondents are hardly in a position now to complain that they lacked sufficient notice of what was expected of them in order to forestall the termination of their parental rights and accomplish the return of the children to their custody. The Supreme Court has also held that when a person’s conduct thus falls squarely within the the proscription of the statute (in this case to co-operate in implementing that specific plan of rehabilitation) that person may not invoke the vagueness doctrine because the statute may be indefinite in its application to others. (See Parker v Levy, 417 US 733, supra; Civil Serv. Comm. v Letter Carriers, 413 US 548, supra; and Colten v Kentucky, supra.)
The second prong of respondents’ constitutional attack is based upon a claimed infringement of their right of privacy in that the failure to plan ground for termination of parental rights is claimed to represent an unwarranted intrusion upon parental freedom to rear their children as they wish and their intimate family life. Unquestionably the freedom to rear one’s child is the kind of personal activity included within the right of privacy protected under interpretations of the First Amendment by the United States Supreme Court in such cases as Wisconsin v Yoder (406 US 205), Griswold v Connecticut (381 US 479) and Roe v Wade (410 US 113). A reading of these decisions, however, makes it clear that the State’s invasion of respondents’ privacy alone is not determinative of the invalidity of the statute. These cases stand for the proposition that the right of privacy is not absolute, but must be balanced against legitimate State interests. As stated in Roe v Wade (supra, p 154), perhaps the most extreme of the privacy cases: "We, therefore, conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation.”
The welfare of children has been recognized repeatedly as an area of legitimate State concern, even when pursuit of that concern has impinged upon fundamental rights. As stated by no less zealous an advocate of personal freedom than Mr. Justice Rutledge, in Prince v Massachusetts (321 US 158, 166-168): "but the family itself is not beyond regulation in the public interests, as against a claim of religious liberty. * * * And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interests in *745 youth’s well being, the state as parens patriae may restrict the parent’s control by requiring school attendance, regulating or prohibiting the child’s labor, and many other ways. * * * The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child’s welfare”. Here, respondents forfeited any absolute right to the privacy of their child-rearing decisions when they admitted to neglect in the previous proceeding under article 10 of the Family Court Act. The court, in Wisconsin v Yoder (406 US 205, 230, supra) in upholding the supremacy of parental decisions on education of children, expressly stated: "This case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred.”
In the instant case, there can be no doubt of the State’s legitimate concern in preventing the twofold evils of protracted foster care, namely, its harmful effects upon proper child development and the fiscal impact of the cost of indefinite maintenance of children by the State. Also to be balanced against respondents’ right of privacy is the right of the children, who are also persons within the meaning of the Fourteenth Amendment (Matter of Gault, 387 US 1) to continuous care in a stable, permanent home environment. As discussed previously, the means selected here to further these legitimate countervailing interests are appropriate in mandating that parents plan for their child’s future by making concrete preparations to be able to provide its adequate, stable care in their own home or suffer the loss of their ability to prevent its placement for such care in a permanent, adoptive home. Furthermore, New York’s permanent neglect statute does not manifest any callous disregard of parental rights. A judicious balancing of parental right and State interests is demonstrated by its requirement of proof of diligent agency efforts to strengthen the parental relationship and of parental physical and financial ability to keep in contact and plan, before an adjudication of permanent neglect may be made. In Roe v Wade (410 US 113, supra) the Supreme Court held that at the point of fetal viability the State’s legitimate interests in the protection of health, medical standards and prenatal life become dominant over the pregnant mother’s right of privacy in the abortion decision, permitting the State to prohibit an *746 abortion thereafter except when necessary to preserve the life or health of the mother. Similarly, I have concluded that after a year of foster care, when a parent has failed either to keep in substantial and continuous contact with the child or to plan for its future by the formulation of a realistic program to provide a stable adequate home atmosphere and to act upon that plan although physically and financially able to do so, despite diligent agency efforts to aid the parent toward that goal, the interests of the State and of the child in freeing it for adoption also become dominant over respondents’ right of privacy.
The final contention of the respondents is that the statute is invalid under the equal protection clause. Preliminarily it may be observed that the statute on its face does not treat persons similarly situated differently nor does it reveal any distinctions in the treatment of the respondents or indeed any parent or child on such "suspect” bases as race, creed, national origin, wealth or class status. Nor have respondents claimed that the statute in its application produces any invidious discriminatory effects on such bases or any similar bases. This fact, under the more recent Supreme Court cases, affects the scope of review under the equal protection clause. As stated by the court in Buckley v Valeo (424 US 1, 30-31), in reviewing the campaign contribution limitations of the 1974 Federal election campaign reform legislation: "Apart from these First Amendment concerns, appellants argue that the contribution limitations work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face. In considering this contention, it is important at the outset to note that the Act applies the same limitations on contributions to all candidates regardless of their present occupations, ideological views or party affiliations. Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions.” (Emphasis supplied.)
Respondent’s claim that the statute is discriminatory in that a distinction is made between parents whose children are in the care of an authorized agency, who are exclusively subject to the sanction of termination of parental rights for permanent neglect, and all other parents, is an ingenious argument but in my view a specious one. The evil addressed *747 by the statute is the effect of protracted foster care upon the thousands of children in the custody of authorized agencies, and not any other evils which may be visited upon children in the custody of their own parents or other private guardians, which are addressed in other statutes. To say that this statute is discriminatory in singling out the evils of protracted foster care because it thereby affects parents of children in care differently than all other parents logically leads to the conclusion that every statute is prima facie subject to equal protection review and vulnerable to attack, since legislation addressed to any particular problem inevitably has the effect of creating some form of classification and treating some people differently than others. As stated in Dixon, The Supreme Court and Equality: Legislative Classifications, Desegregation, and Reverse Discrimination, 62 Cornell L Rev 494, 499: "The underlying problem in using the equal protection clause as an instrument for legislative review is that virtually all legislation classifies.” This does not appear to be the kind of discrimination triggering equal protection review under the case law. As stated by Mr. Justice Stewart in his concurring opinion in San Antonio School Dist. v Rodriguez (411 US 1, 59-60): "Unlike other provisions of the Constitution, the Equal Protection Clause confers no substantive rights and creates no substantive liberties. The function of the Equal Protection Clause, rather, is simply to measure the validity of classiñcations created by state laws. There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory — only by classifications that are wholly arbitrary or capricious.” In fact, this statute itself does not create any class of parents whatsoever, but deals with a class of children, and respondents and other parents only become affected by the statute through their own actions, since a child under New York law may only come under the care of an authorized agency through the neglect, abuse or abandonment of the child (under article 10 of the Family Court Act), or their voluntary transfer of the child into foster care (under now section 384-a of the Social Services Law).
Even if I were, however, to accept respondents’ contention *748 that the equal protection clause applies to the statute because of distinctions made between parents of children in foster care and other parents and even if I were further to accept the argument that the "strict scrutiny” test of review applies by reason of the statute’s infringement of "fundamental rights” of parents, I would nevertheless hold that the statute is constitutional. As previously discussed, and conceded by respondents, the State of New York has a "compelling interest” in providing for the placement of foster children in a permanent stable home, either with their natural parents or adoptive parents. Thus, the first facet of the "strict scrutiny” test is satisfied here. The second facet requires that the statute be so narrowly drawn that there appears to be no other reasonable alternative for achieving the legitimate goal which has less severe impact on the fundamental rights involved. (See Shapiro v Thompson, 394 US 618; and Dunn v Blumstein, 405 US 330.) Specifically, respondents assert that "the failure to plan” ground for termination of parental rights in the statute is overly broad in this respect. As previously described, the statute is quite narrowly drawn, even when the failure to plan ground is invoked, through the definition of "plan”, and the further requirements of proof of at least one year of continuous foster care, the physical and financial ability of the parents and diligent agency efforts. These requirements compare favorably, in terms of restrictiveness of standards, with most other States’ termination statutes (see 46 St. Johns L Rev, supra, pp 216-217 and with the Model Statute for Termination of Parental Rights, set forth in 27 Juvenile Justice, 5-8 [Nov. 1976]). The respondents in their briefs have not suggested any alternative to the statutory scheme less restrictive of their fundamental parental rights which could accomplish the legislative objective. Clearly, the legislative history, as previously quoted from the decision in Matter of Orlando F. (40 NY2d 103, supra) established that the prior requirement of proof of both failure to keep in contact and to plan on the part of the parent was ineffective to free foster children for adoption when their parents were unwilling to take positive steps to restore them to their own home with adequate care. I have concluded, therefore, that the statute is valid even under the "strict scrutiny” test.
Moreover, both courts and commentators have criticized the two-tiered approach evolved by the Supreme Court in the 1960’s in equal protection cases, in which the strict scrutiny *749 test was applied where suspect classes or fundamental rights were affected by State legislation, and the "minimum rational basis” test was applied in all other cases, and have noted a gradual erosion of that approach under the Burger court and a trend toward a third approach which analyzes and balances the public and private interests affected, closely examines the probable effects of the legislation and upholds the statute where there is legitimate State interest and a "substantial rational connection” between the legislation and that interest. (See the dissenting opinion of Mr. Justice Marshall in Massachusetts Bd. of Retirement v Murgia, 427 US 307, 317; Matter of Malpica-Orsini, 36 NY2d 568; Gunther, The Supreme Court, 1971 Term-Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1; Comment, Illegitimacy and Equal Protection, 49 NYU L Rev 479; and Dixon, 62 Cornell L Rev, 494, supra.) The retreat from judicial activism in the equal protection area this represents is evident from the most recent Supreme Court decisions reviewing legislation in areas previously considered to have impinged on suspect classes or fundamental rights. (See San Antonio School Dist. v Rodriguez, 411 US 1, supra; Buckley v Valeo, 424 US 1, supra; Maher v Roe, 432 US 464.)
Clearly, from the previous discussion, New York’s permanent neglect statute is sustainable under the "substantial rational basis” test. The Court of Appeals’ decision in Matter of Malpica-Orsini (supra), is in my view a fortiori controlling. The same fundamental right was involved in Malpica as in the instant case, namely, the right of a natural parent to prevent the adoption of his child by withholding consent. In that case, the court dealt with the provision of section 111 of the Domestic Relations Law permitting the adoption of an illegitimate child upon notice but without the consent of its natural father. In Malpica, the discrimination, appeared upon the face of the statute, which expressly distinguished between the consent requirements for adoption, on the part of the parents of a legitimate and an illegitimate child. Here, as previously indicated, no such discrimination appears in the statutory language. Moreover, in Malpica, the court was dealing with distinctions based upon illegitimacy, which theretofore had been considered a suspect classification under previous Supreme Court decisions. Nevertheless, the court upheld the constitutionality of the statutory distinction and the infe *750 rior classification of the father of an illegitimate child, recognizing the legitimate State interest in securing a normal home and a permanent, stable parental relationship for a child and holding that the statute dispensing with the power to veto an adoption by a putative father "bears a significant relationship to the recognized purpose which section 111 of the Domestic Relations Law commendably serves.” (36 NY2d, at p 575). On the basis of Malpica, and for the reasons previously stated, I find no violation of the equal protection clause in New York’s permanent neglect statute.
Respondents’ motions to dismiss the petitions herein are therefore denied, and the parties and their respective attorneys are directed to appear before me for trial on October 24 and October 25, 1977 at 9:00 a.m.

. In 1976, the Legislature comprehensively revised and reorganized all the laws dealing with termination of parental rights, incorporating the substantive provisions of these laws, including permanent neglect, in new section 384-b of the Social Services Law (L 1976, ch 666, eff. Jan. 1, 1977). The new statute (§ 384-b, subd [7], par [c]) expressly defines "plan for the future of the child”, to "take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative”. The definition also permits the court to "consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available”. Thus the revision largely incorporates the previous judicial construction of the planning requirement. In Matter of Ray A. M. (37 NY2d 619) and Matter of Orlando F. (supra), the Court of Appeals held that the law "as it exists today” should be applied in permanent neglect cases, but with respect to failure to plan, no substantially different result would be reached under the new than under the prior statute.

. The vagueness doctrine is even less strictly applied when the indefiniteness of the statutory language does not result in a "chilling effect”, inhibiting the full exercise of constitutionally protected and encouraged rights under the First Amendment to free expression and to engage in political associations and activities. Thus, an attack on vagueness has almost never been recently upheld when it relates to economic or business regulation. (See Willamson v Lee Optical Co., 348 US 483.) No such "chilling effect” is involved in the instant case, since the purpose of the statute is to encourage, not restrict, the fullest exercise of parental rights and responsibilities. Any unclarity in the meaning of the statute would thus only work to the encouragement of parental conduct tending to result in the fullest exercise of such rights by restoration of the child to the home and custody of such parents.