■ In the Matter of MICHAEL B., a Child Alleged to be Permanently Neglected. BROOME COUNTY DEPARTMENT OF SOCIAL SERVICES, Appellant; DARLENE B., Respondent; CHARLES FF. et al., Intervenors-Appellants. — Appeal from an order of the Family Court of Broome County (Whiting, Jr., J.), entered March 14, 1983, which dismissed the petition seeking an adjudication of permanent neglect pursuant to article 6 of the Family Court Act. A permanent neglect proceeding was initially brought by petitioner Broome County Department of Social Services against respondent regarding her son on December 17, 1980. The petition alleged that petitioner had made diligent efforts to encourage and strengthen the family relationship; that respondent failed for a period of one year following the date petitioner gained custody to substantially and continually or repeatedly to maintain contact with or plan for the future of the child; and that the best interests of the child required guardianship and custody to be with petitioner. The Family Court granted the petition. On appeal (*Matter of Michael B.,* 88 AD2d 700), this court modified Family Court's order which had granted the petition upon a fair preponderance of the evidence. It was held that the Family Court record supported a grant of the petition by clear and convincing evidence, the criteria enunciated as binding in neglect proceedings in the Supreme Court's ruling in *Santosky v Kramer* (455 US 745), and that a new hearing *de novo* was not necessary. The Court of Appeals (*Matter of Michael B.,* 58 NY2d 71) reversed and held that the evidence in the record was legally insufficient to meet the clear and convincing standard and remitted the matter for a new hearing. The court said that a new hearing was mandated in that the evidence failed to establish that the mother did not maintain contact with or plan for the future of the child under the *Santosky* criteria. The new hearing consisted of inclusion in the record of the March, 1981 proceedings by stipulation and additional testimony. The record indicates that the child came to petitioner's foster care on October 29, 1979 when respondent surrendered him. Petitioner set up supervised visits with respondent and her son and it was observed that her treatment of the child was curt and aloof. She handled him roughly and failed to demonstrate any of the affection she clearly gave her daughter. Respondent made three visits with him but failed to keep an appointment to visit her child in December of 1979. Thereafter, she left Binghamton without notice and was gone from January to October of 1980. Respondent went to Texas with a male friend, who was 18 years of age, and with other members of his family. She lived there for three months. While there, she cohabited with her boyfriend. The two of them, and her daughter, shared the same sleeping quarters. Petitioner sent a letter to respondent in care of her parents' home and was notified by the family of her whereabouts. Petitioner then wrote to her in Texas and advised her of her responsibilities to visit her child and to plan for his future. In response, respondent called petitioner and informed the department that she was now in West Virginia and that she would like to get her son back. Petitioner requested an investigation from West Virginia social services authorities to see what conditions prevailed where respondent lived. However, she had moved again. Respondent's mother once again informed petitioner of her daughter's new

address. On August 7, 1980, petitioner wrote to respondent at her new address and indicated what her responsibilities were to her child. She was also advised, to allay fears she had expressed, that the evaluation of her ordered by Family Court at a mental health clinic was not intended to commit her to any psychiatric center but was sought merely as an evaluative tool to determine what assistance she needed before her son could be returned to her. The letter was returned as undeliverable. Respondent's caseworker spoke with respondent by phone on September 18, 1980 and was advised that she was living in Ohio. Petitioner then called the social services agency in Ohio and followed with a letter on September 24, 1980, asking for an evaluation of respondent's current situation. The caseworker sent another letter on October 22, 1980 to the Ohio Department of Social Services indicating with whom contact was to be made in her absence due to maternity leave. On October 21, 1980, respondent left a phone message with petitioner indicating that she was in town and asking that she be allowed to visit her son. A visit was hurriedly arranged to accommodate her brief stay in Binghamton. Respondent indicated when she came for the visit that she would remain in Binghamton. She was advised again by her current caseworker, Sandra Mantle, what she needed to do to have her son returned to her. She was instructed that she must comply with the court order for a psychiatric and psychological evaluation, find adequate living space, adequate financial resources, i.e., a job or public assistance, and finally, conduct regular and frequent visitation with the child. Respondent visited the child on October 31, 1980. On November 3, she consented by phone to the mental health evaluation but she failed to call back as directed for the scheduled date. A notice was sent to respondent for a November 18, 1980 appointment which she failed to keep. She claimed the notice was misdirected and that she did not get it on time. Respondent was seen again on December 1 by her caseworker and reported that she was applying for public assistance, since she was unable to work due to mononucleosis, and that she wanted her mother to have the child because she would be on her back for six months. Respondent requested a three-day visit with her son for the Christmas holidays. Mrs. Mantle advised her that a permanent neglect proceeding was being instituted and that she would be granted a supervised visit with her child. Respondent failed to follow through on the Christmas visit. Respondent testified at the initial hearing that she did not voluntarily surrender her son and that she left Binghamton because she feared petitioner would take her daughter as well. She went to Texas and remained there for three months with her present fiancé and then went to West Virginia and Ohio. Although West Virginia authorities gave her money to return to New York to see her son, she used the money instead to go to Ohio. In Ohio, she lived with a man and became pregnant, but lost the child. Respondent claimed that she amassed some $600 of money and returned to New York to set up an appropriate home for her son. She claimed that she did not go to the psychiatric clinic because the notice from petitioner was misdirected. She also testified that she presently shared an apartment with her fiancé. She claimed that when she returned to Binghamton, she lived with her parents and then moved to 213 Chenango Street. She set up an apartment there and was joined by her fiancé. At the 1983 hearing, her fiancé testified, contrary to her testimony, that respondent did not establish any apartment for herself on her return to Binghamton but rather moved in with him at his mother's apartment. The fiancé testified that he found a job as a caretaker and was given a one-room apartment for one-half rent as payment for his work and that it was he who paid for the apartment in which the two of them reside, together with respondent's daughter. He disclosed that, contrary to respondent's testimony, he lived with her in Texas for three or four months. He also indicated that respondent received timely notice

of the psychiatric evaluation appointment but declined to attend. He testified that respondent worked only briefly and that her illness which she characterized as mononucleosis indisposed her for only two days. A friend of respondent testified that on respondent's return to Binghamton, she lived with her briefly. Respondent told her that she had lived with a man in West Virginia. The witness indicated that she knew that respondent had two brief alliances with other men after her return to Binghamton and that, on one occasion, she left her daughter with the witness and remained out overnight with a man she had just met. Evidence also disclosed that after respondent's return to Binghamton, although she was not far removed from her son's foster home, her visits to him were sporadic and brief. At the end of the second hearing, Family Court made no factual findings concerning the allegations of permanent neglect but found the evidence inadequate and dismissed the petition. The Court of Appeals indicated that the new hearing was to be held to allow petitioner an opportunity to address the requirement of more stringent proof enunciated in *Santosky* (*supra*). On this record, we find that petitioner has met that burden. It is obvious that despite respondent's failure to advise the department of her whereabouts, petitioner, by its own diligent efforts, located her and made attempts to re-establish the relationship between respondent and her son. We find, too, that respondent failed substantially and continuously to plan for the future of her child. Though her sporadic visits and phone calls to petitioner indicated a wish to reclaim her son, she failed to take steps to set up an adequate home for him and to make any realistic plans to regain custody. Her testimony as to having saved money to set up an apartment for her child was totally discredited by her subsequent actions of moving in with a friend, then into her boyfriend's mother's home, and finally into a one-bedroom apartment with the boyfriend and her daughter. Her dalliances, meager work record, exaggerations as to her illness and failure to seek counseling all indicate by clear and convincing evidence that her child is permanently neglected (*Matter of Kimberly Marie DD.*, 93 AD2d 919). Respondent has failed to accept the parental role. Her unwillingness to substantially plan for her child's future in any meaningful way supports such a finding. It is settled that a finding of either a failure to maintain contact or a failure to plan for the child's future is sufficient to support a finding that the child is permanently neglected (*Matter of Orlando F.*, 40 NY2d 103; *Matter of Melanie Ruth JJ*, 76 AD2d 1008). Order reversed, on the law and the facts, without costs; petition granted, Michael B. is adjudged permanently neglected, and custody is transferred to the Broome County Department of Social Services, which is authorized to consent to the adoption of the child subject to the order of a court of competent jurisdiction. Kane, J. P., Main, Mikoll, Yesawich, Jr., and Levine, JJ., concur.