In the Matter of DELORES B. CARDINAL MCCLOSKEY CHILDREN'S AND FAMILY SERVICES, Appellant, v WILLIE B., Respondent.

In the Matter of WILLIE JOHN B., JR. CARDINAL MCCLOSKEY CHILDREN'S AND FAMILY SERVICES, Respondent, v WILLIE B., Appellant.

First Department, October 20, 1988

APPEARANCES OF COUNSEL

*David H. Berman* of counsel *(Gerald E. Bodell* with him on the brief; *Bodell & Gross,* attorneys), for Cardinal McCloskey Children's and Family Services.

*Ruth N. Cassell* and *David C. Leven* of counsel *(Prisoners' Legal Services,* attorneys), for Willie B.

## OPINION OF THE COURT

SMITH, J.

The issue in this case is whether a father who is serving two concurrent sentences of 25 years to life for murder should be found to have permanently neglected his two children so that his parental rights may be terminated and the children freed for adoption. (Social Services Law § 384-b [4] [d].) We conclude that in this case the facts support such a finding and his parental rights should be terminated.

On or about June 14, 1984, petitioner instituted two separate proceedings in Family Court to terminate the parental rights of respondent father on the ground that he had permanently neglected the children within the meaning of Social Services Law § 384-b. Following a joint fact-finding hearing, the Family Court reluctantly dismissed the petition concerning the infant Delores B. The Family Court determined that it was constrained by recent amendments to the Social Services Law, Domestic Relations Law and Correction Law (L 1983, ch 911, eff Jan. 1, 1984), regarding termination of parental rights of an incarcerated parent, to hold that respondent, a prisoner, had done all he could to plan for the child and had not permanently neglected her *(Matter of Delores B.,* 130 Misc 2d 484 [Fam Ct, NY County 1985]). However, the Family Court found the infant Willie B. to be a permanently neglected child, determining that even prior to his incarceration respondent had failed to plan for Willie's future.

The infant Willie B., born on August 10, 1975, has been in the petitioner agency's care since his placement on July 1, 1977. Willie's foster parents wish to adopt him. He has been

in four other foster homes and has behavioral problems. The infant Delores B., born on August 16, 1979, several months after her father's incarceration, has been in the care of petitioner agency since her placement on July 31, 1980. On May 16, 1981, the natural mother, Delores B., executed a surrender of Willie for purposes of adoption. Her parental rights to custody and guardianship of the child Delores were terminated by court order on September 12, 1983. She is not a party to these proceedings.

Respondent father, Willie Bethea, is currently serving two concurrent terms of imprisonment of from 25 years to life for murder. The convictions result from an incident in which defendant, angered that his mailbox had been broken into and his welfare check stolen, set fire to his mattress and when he could not put out the blaze, left the building without giving an alarm and caused the death of a 74-year-old woman and her two-year-old granddaughter. He has been incarcerated since April 10, 1979. The Appellate Division, Second Department, affirmed his judgment of conviction *(People v Bethea,* 94 AD2d 982 [2d Dept 1983]) and the Court of Appeals denied leave to appeal *(People v Bethea,* 60 NY2d 589 [1983]). The United States District Court, Eastern District, denied petitioner's writ of habeas corpus and the Court of Appeals, Second Circuit, affirmed the decision *(Bethea v Scully,* 834 F2d 257 [1987]).

On appeal of the order terminating his parental rights with respect to Willie, respondent argues that: (1) petitioner failed to establish that it had fulfilled its statutory obligation to exercise diligent efforts to strengthen the parental relationship before seeking to terminate respondent's parental rights; (2) the Family Court incorrectly based its determination on a span of time prior to respondent's incarceration; and (3) the Family Court erred in determining that respondent had failed to plan for Willie's future. Petitioner agency contends that the Family Court properly terminated the respondent's parental rights with respect to Willie since, notwithstanding the petitioner's diligent efforts, respondent did not consistently visit Willie or plan for his future. It argues further that the Family Court erred in "excusing" respondent's failure to plan for Delores because of his incarceration. Finally, it contends that the best interests of both children lie in terminating respondent's parental rights.

Prior to the enactment of Laws of 1983 (ch 911) respecting the "termination of the parental rights of an incarcerated parent", an incarcerated father had no authority to consent to

or refuse to consent to the adoption of a child. Thus, Domestic Relations Law § 111 (2) (former [d]) provided that the consent of a parent to adoption was not required of a person "who has been deprived of civil rights pursuant to the civil rights law and whose civil rights have not been restored". Civil Rights Law § 79 (1) states that a person who is serving an indeterminate term of imprisonment with a maximum of life "forfeits all the public offices", and also "suspends, during the term of the sentence, all the civil rights * * * held by, the person sentenced." Civil Rights Law § 79-a (1) states that a person sentenced to prison for life is "civilly dead".

Because Laws of 1983 (ch 911) gave an incarcerated parent the authority to consent or withhold consent to adoption and respondent has declined to consent to freeing his children for adoption, his parental rights may be terminated only by clear and convincing proof that he has permanently neglected his children. (Social Services Law § 384-b [3] [g]; [4] [d].)

Social Services Law § 384-b (7) (a) defines a "permanently neglected child" as: "A child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child."

Applying the definition to the facts of this case, it is clear (1) that the petitioner agency has met its burden of exercising diligent efforts to strengthen the relationship of parent and child, (2) that the respondent has failed to adequately plan for his children, and (3) that the legislative intent that children grow up in a normal family setting is served by terminating the parental rights of the respondent.

First, the threshold issue in any neglect proceeding is "whether a child-care agency has exercised diligent efforts to encourage and strengthen the parental relationship". (Matter of Sheila G., 61 NY2d 368, 380 [1984].) The Family Court correctly determined that the petitioning agency was diligent in its efforts to aid the family. Evidence adduced at the fact-finding hearing reveals that petitioner, through its caseworkers, arranged meetings with the parents, set up scheduled

visits with the children and endeavored to contact relatives who might care for the children.

Specifically, Philip White, a supervisor, testified to contact between the natural parents and the agency between April 1978 and January 1979. The first contact between petitioner and respondent was on April 11, 1978. On May 5, 1978, a visit was arranged between the natural parents and the child Willie. Respondent attended. The agency provided the parents with a visitation schedule during a visitation meeting held on June 7, 1978. Of the approximately eight scheduled visits between June 23, 1978 and September 14, 1978, respondent attended only two. On one of those occasions respondent arrived too late to see Willie. Respondent called on two occasions to cancel visits because of problems resulting from Delores B.'s (natural mother's) pregnancy and delivery. Letters reminding the parents of the meetings were addressed to the mother. Respondent, however, had access to those letters.

The caseworker assigned to the case of Willie, Arlene Ferguson Henderson, testified that she arranged a meeting with the parents and Willie in February 1979. The parents failed to attend an earlier meeting scheduled for January 17, 1979. At a March 9, 1979 meeting, she provided respondent with a visitation schedule for four visits in March, April and May of 1979. Respondent failed to attend the first visit on March 26, 1979 and the social worker later learned that he had been arrested on or about April 10, 1979. He did not attend the next scheduled visit. The social worker contacted respondent several times thereafter regarding his plans for Willie. At respondent's recommendation, she attempted to contact several of his relatives with the hope that they could care for Willie. The attempt to find a suitable relative willing and able to care for the child was unsuccessful. During this period, respondent contacted Ms. Henderson to inquire about Willie. Arrangements were made to bring Willie to visit respondent in prison on at least one occasion.

Another caseworker, Esham Johnson, assigned to the Delores B. case on October 27, 1980, testified that approximately once a month, he contacted respondent in prison to keep him apprised of the child's progress and performance. He met with respondent in prison on several occasions and brought Delores along on these visits.

The agency, in attempting to maintain and strengthen the parental bonds, arranged visits, communicated with respon-

dent concerning the children's progress, and communicated with relatives who might care for the children. It is difficult to imagine what other steps petitioner could have taken, particularly after respondent's incarceration. Social Services Law § 384-b (7) (f) defines "diligent efforts" to include consultation and cooperation to develop a plan for a child and his family, informing parents of a child's progress and development, and making arrangements with a correctional facility for visits by a child with his parent "if such visiting is in the best interests of the child" (Social Services Law § 384-b [7] [f] [5].)

Second, petitioner agency also met its burden of proof that respondent had not planned for the future of his children.

In discussing Social Services Law § 384-b (7) (a), the Court of Appeals has stated, "The requirement is several: the parent must maintain contact with the child and also realistically plan for her future. A default in performing either may support a finding of permanent neglect" *(Matter of Star Leslie W.,* 63 NY2d 136, 142-143 [1984]). In the present case, aside from providing names of relatives who were either unable or ill-suited to care for the children, respondent's only plan concerning Willie during his incarceration was to allow the child's present foster parents to care for him until his release from prison. This plan is not realistic by virtue of defendant's long sentence of 25 years to life. When asked whether he made plans for Delores, he replied, "No".

Even prior to his incarceration, respondent failed to offer any substantial plan for Willie's future. It must be emphasized that Willie remained in foster care for approximately two years before respondent's incarceration with no plans made for his future. To plan within the meaning of the statute is " 'to formulate, and act to accomplish, a feasible and realistic plan' " *(Matter of Orlando F.,* 40 NY2d 103, 110 [1976]).

The fact of a parent's incarceration does not in itself render him physically or financially unable to maintain contact with or plan for the future of his children. The concept that incarceration renders a parent unable to maintain contact or plan for his child's future was rejected with the repeal of Social Services Law § 384-b (7) (d) (former [ii]) and amendments to the Domestic Relations Law and Correction Law which, prior to 1984, did not require an incarcerated parent's consent to an adoption. Social Services Law § 384-b (7) (d) (former [ii]) had deemed an incarcerated parent unable to maintain contact with or plan for the future of the child when

incarcerated. An incarcerated parent's obligation to his child is now the same as that of any other parent. (Social Services Law § 384-b.) The New York State Legislature has emphasized the responsibility of an incarcerated parent towards a child (Legislative findings and declaration, L 1983, ch 911, § 1 [ii], [iii]):

"(ii) A parent who has been incarcerated, however, does and should have an obligation to fulfill, while actually incarcerated, the requirement set forth in section three hundred eighty-four-b of the social services law, of visiting or communicating at least once every six months with the child or authorized agency. Having failed to fulfill such requirement, such parent should have his or her parental rights terminated upon the ground of abandonment pursuant to section three hundred eighty-four-b of the social services law;

"(iii) A parent who has been incarcerated should also fulfill, while actually incarcerated, the obligations of a parent as described in the provisions of section three hundred eighty-four-b of the social services law relating to the termination of parental rights upon the ground of permanent neglect. However, such ground of permanent neglect should recognize the special circumstances and need for assistance of an incarcerated parent to substantially and continuously or repeatedly maintain contact with, or plan for the future of his or her child. An incarcerated parent who has failed to fulfill these obligations may have his or her parental rights terminated upon such ground".

If incarceration rendered a parent unable to plan for his or her child, then every incarcerated parent would have an automatic excuse for failing to meet his or her statutory obligation.

Third, the termination of the respondent's parental rights furthers the legislative intent that children grow up in a normal family setting in a permanent home in order to develop and thrive, that the natural parents have priority in raising their children, but that when the parent cannot or will not provide a normal family home, termination of parental rights and efforts at adoption are preferable to prolonged foster care. The statement of legislative findings and intent which is a part of Social Services Law § 384-b enunciates the clear intent of the Legislature. It reads as follows:

"§ 384-b. Guardianship and custody of destitute or dependent children; commitment by court order

"1. Statement of legislative findings and intent.

"(a) The legislature hereby finds that:

"(i) it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive;

"(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child's need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;

"(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and

"(iv) when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.

"(b) The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the rights of the natural parents could reduce such unnecessary stays.

"It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nuturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating parental rights and freeing the child for adoption."

In reaching its decision, the Family Court decried the fact that the rights of an incarcerated parent were now paramount to that of a child. It said: "It has become clear in this court in many similar cases that the amended statutes affecting prisoners' rights are not reforms for the children. This court sees incarcerated parents regularly, and it is clear that such a parent is likely to express great interest in a child and fight for his or her right to prevent the child's having a full life

separate from that parent. Often this happens because the imprisoned parent has nothing else to do. It may happen because the parent loves the child and cannot objectively assess the effects of that love. However real the concern for the child may be, a parent who will never be an active parent may prevent the child's ever having one" *(Matter of Delores B., supra,* 130 Misc 2d, at 485).

We conclude that the Family Court erred not only in finding that, on this record, there could be no permanent neglect, but also in its conclusion that the rights of an incarcerated parent are superior to those of the child. When the Legislature concluded that the fact of incarceration should not automatically take away a parent's right to consent or not to consent to adoption, it did not raise an insuperable barrier to a normal family upbringing for a child. The plan advanced by the respondent was for care of his children by relatives, a plan which could not be implemented. His only other plan was to have the children remain in foster care throughout their childhood. This is contrary to the intent of the Legislature.

Finally, on the issue of terminating respondent's parental rights and his fitness to remain a parent, it cannot be overlooked that he set a fire and walked away from it, leaving two persons to die, one an elderly grandmother and the other a mere infant. What we have in this case is a father who showed little interest in his son when he was out of prison and who was in prison when his daughter was born. While respondent's interest in the children has increased during his incarceration, he has nevertheless failed to plan realistically for their futures. It is clear that the best interests of the children lie with termination of the father's rights.

Accordingly, order, Family Court, New York County (Leah Marks, J.), entered December 12, 1985, which dismissed a petition brought pursuant to Social Services Law § 384-b seeking to terminate the parental rights of respondent Willie Bethea and to free the infant Delores B. for adoption, should be reversed, on the law and the facts, the petition granted and the matter remanded for a dispositional hearing, without costs, and further, order, Family Court, New York County (Leah Marks, J.), entered February 28, 1986, which, *inter alia,* adjudged the infant Willie John B., Jr., to have been permanently neglected by respondent within the meaning of Social Services Law § 384-b and ordered respondent's parental rights terminated and the guardianship and custody of said child

transferred to petitioner for its consent to his adoption, should be affirmed, without costs.

CARRO, J. (dissenting). There is perhaps no event in life as tragic as the loss of a child. There is perhaps no power of the State as intrusive and as painstakingly difficult to exercise than the power of the State to terminate the constitutionally protected rights of a parent to the companionship, custody, care and management of his or her child. Termination of parentage is permanent and irrevocable and "leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important * * * emotional, or physical development." (Lassiter v Department of Social Servs., 452 US 18, 39 [Blackmun, J., dissenting].) In so doing, "it cuts across a norm of nature as instinctive and as fulfilling as only procreation and the ensuing bond between parent and offspring can be". (Matter of Ricky Ralph M., 56 NY2d 77, 80.)* That power may not be exercised except by strict and faithful conformance to the requirements of due process and to the statutory provisions of Social Services Law § 384-b, which specifies the procedures and criteria for terminating parental rights (supra, at 80-81).

Given society's solemn regard for the parent-child bond, it is surprising that before 1983 the State was not required to obtain the consent of an incarcerated parent before releasing that parent's child for adoption. To ameliorate this harsh result, and perhaps to correct the dubious constitutionality of the automatic termination of parental rights absent any finding of unfitness, the State Legislature enacted Laws of 1983 (ch 911) (eff Jan. 1, 1984) to amend the Social Services Law and the Domestic Relations Law to require the consent of or termination of the parental rights of an incarcerated parent before that parent's child could be released for adoption.

The amendment also provided that concomitant with the incarcerated parent's right to object to adoption is his or her

---

* The question of court-ordered "open adoptions", whether a court, after termination of parental rights, can order that ties with the biological family be continued, is one not yet firmly resolved in this State. (See, Matter of Joyce T., 65 NY2d 39, 46-47, n 2.) One Family Court in an insightful opinion which notes the growing body of research revealing "the importance of a child's links to known ancestral, religious, ethnic and cultural backgrounds", and the psychological damage that "shrouding a child's background" can have on the child, has argued that open adoptions can be ordered pursuant to the court's inherent equitable powers to promote the child's best interest. (Matter of Anthony, 113 Misc 2d 26, 28-32.)

obligation to plan for the future of his or her child, "while actually incarcerated", or forfeit parental rights pursuant to Social Services Law § 384-b (4) (d). *(See,* Legislative findings and declaration, L 1983, ch 911, § 1.) Determining how the special circumstances of incarceration affect this duty to plan is the subject of this dissent.

Since I have no disagreement with the majority in its statement of the facts, I will adopt the factual summary of the majority opinion. I will note, however, my disagreement with the conclusion of the Family Court that during the period of time prior to respondent's incarceration the agency fulfilled its statutory obligations under Social Services Law § 384-b (7) (a), (f) of diligently assisting respondent in planning for Willie's future. This threshold finding, which a court must make before reaching the issue of whether the parent met his or her duty to plan, permitted the Family Court to conclude that during this period of time respondent neglected Willie. The majority, as well, rely on this finding to establish respondent's parental unfitness. Yet, a review of the record before us wholly fails to support this conclusion.

The agency introduced no evidence of any services it provided or suggestions it made to respondent prior to his incarceration regarding the return of Willie to the home. So barren is the record in this regard that it is not even known what financial, social, psychological or environmental obstacles there were which prevented Willie's return home. No evidence exists that the agency made any attempt to ascertain what difficulties the parents were encountering which event prevented them from attending the scheduled visits. There were unexplained periods of time lasting months when the agency did not so much as contact the parents. The only efforts made by the agency were to schedule visits and stress the importance of these visits.

These efforts were not sufficient to establish satisfaction of the agency's strict duty to assist the family in a meaningful way, that is, in a manner designed to foster and maintain substantive contact between parent and child, to strengthen and unite the family, and to identify and seek to eliminate the obstacles impeding the child's return to the home. *(See, Matter of Jamie M.,* 63 NY2d 388, 395; *Matter of Sheila G.,* 61 NY2d 368, 384.)* Furthermore, as it is recognized that the agency's indifference or failure to assist diligently "may have a profound practical effect on what later may be viewed as the success or failure of the parents' efforts to plan for the future

of the child" *(Matter of Sheila G., supra,* at 382), it is particularly unfair for this court to emphasize respondent's failure to devise a plan prior to his incarceration as additional proof of his unfitness to be a parent.

I do agree, however, that the agency fulfilled its statutory obligation to assist respondent once he was incarcerated. Petitioner followed a diligent course of maintaining family contacts and arranging for visitation between respondent and his children. To the extent that the agency could assist respondent in finding an alternative home to foster care for his children, it did so. There was no other assistance the agency could have provided respondent which would have permitted the release of his children from foster care.

This brings us, then, to the issue of whether or not this incarcerated parent fulfilled his duty to plan. That an incarcerated parent has a duty to plan for the future of his or her child is clear from the Legislature's repeal of Social Services Law § 384-b (7) (d) (former [ii]), its inclusion of incarcerated parents within the definition of parents (Social Services Law § 384-b [2]), and the statutory provisions requiring all parents to plan for their children's future (Social Services Law § 384-b [7] [a]). However, I cannot agree with the implicit conclusion of the majority that the fact of incarceration is of no relevance in determining whether an incarcerated parent has fulfilled that duty. This court seems to have overlooked the following important statement in the legislative history from which it quotes: "However, such ground of permanent neglect should recognize the special circumstances and need for assistance of an incarcerated parent to substantially and continuously or repeatedly maintain contact with, or plan for the future of his or her child." (L 1983, ch 911, § 1 [iii].) The determination, then, of what is a realistic plan by an incarcerated parent must take into account the fact of incarceration itself. Support for this conclusion also exists in the Social Services Law provision which restricts a finding of permanent neglect for failure to plan to when the parent is "physically and financially able to do so". (Social Services Law § 384-b [7] [a].)

Little has been written about the meaning of the requirement of physical and financial ability to plan. Some reference to it appears in the legislative history to Laws of 1973 (ch 870) which, *inter alia,* redefined permanent neglect to provide that either a failure to maintain contact *or* plan for the future of the child could support an adjudication of permanent neglect

(as opposed to prior law which required a finding of both elements). The amendment was a direct response to the intolerable plight of those children, who although maintaining contact with their parents, nevertheless remained unnecessarily in foster care year after year, while "the parent or custodian [was] physically and financially able to provide a home but fail[ed] to do so." (Mem of Senator Pisani to L 1973, ch 870, 1973 NY Legis Ann, at 35.) Commenting on that specific statutory amendment, the court in *Matter of Carl N.* (91 Misc 2d 738) observed that under Laws of 1973 (ch 870), termination of parental rights could now occur upon proof that the parents "are *unwilling* to take the necessary steps *within their power and ability* to restore the child to their home" *(supra,* at 741 [emphasis added]).

And, in fact, courts have terminated parental rights on the basis of permanent neglect for failure to plan when the parent has been demonstrated to be physically and financially able to plan, but nevertheless fails to do so *(see, e.g., Matter of Hime Y.,* 54 NY2d 282, 286-287; *Matter of Jennifer VV.,* 99 AD2d 882, 883; *Matter of Suzanne N. Y.,* 86 AD2d 556);* or when the parent, as a result of pure indifference or perhaps some psychologically based deficiency, will not assume responsibility or utilize any of the resources offered to him or her to become physically and financially able to plan. *(See, e.g., Matter of Orlando F.,* 40 NY2d 103, 110-111; *Matter of Louise Wise Servs. [Febra],* 135 AD2d 385; *Matter of Alexander,* 127 AD2d 517, 519-520; *Matter of Nicole TT.,* 109 AD2d 919, 920; *Matter of Michael B.,* 96 AD2d 961, 962-963.)

But, where the failure to plan for the return of the child to the home results not from the parent's unwillingness to assume parental responsibility and take all "necessary steps within their power and ability", but results instead from a physical and/or financial inability due to an "external impossibility" *(see, Matter of Marilyn H.,* 106 Misc 2d 972, 982), a finding of permanent neglect is precluded. Respondent's longterm incarceration imposes just such an external impossibility on his ability to provide a home for his children and precludes a finding that he has permanently neglected them due to his failure, despite doing all that was within his power and ability to do, to devise a plan which will provide an alternative home for his children or their return to him prior to their age of majority.

It is beyond doubt that respondent has done all that he

realistically could to provide for his children, given his physical and financial limitations. Soon after he was incarcerated he notified the agency, advising it of his situation and requesting that visits with his children be arranged. Respondent participated in three planning sessions with the agency, at which he suggested that the agency investigate the possibility of placing his children with relatives. Throughout his incarceration, he has written regularly to his children's social workers and maintained contact with his children. Never did he manifest an indifferent attitude towards his children or their future or assume an uncooperative position.

Because there was nothing else he could physically or financially do, respondent's final plan was to have the children remain in the custody of their foster parents, but preserve his parental right to maintain contact with them and thereby fulfill his parental duty to love, guide and provide them with emotional support. Respondent has made as concerted an effort and assumed as much initiative and responsibility for the care of his children as he possibly could. He cannot be accused of indifference, uncooperativeness, or neglect in failing to utilize any available resources, since, short of his release from prison, there is nothing that can help him provide a home for his children. He is not asking to be excused from his parental obligations. Rather, he seeks to fulfill those obligations through a combination of meaningful contacts with his children and long-term foster care. This requires an examination, therefore, of whether despite respondent's inability to plan anything other than long-term foster care, the Social Services Law prohibits such a plan.

It is true that in enacting Social Services Law § 384-b the Legislature did not intend that planning for the future of a child include long-term foster care. *(See, Matter of Joyce T.,* 65 NY2d 39, 47-48.) It is true that the statute condemns "unnecessary stays" in foster care. But, unnecessary stays are those that persist because of the parent's unwillingness to plan for the return of the child, though physically and financially able to plan, or those that persist despite the parent's proven mental inability to provide adequate care for his or her child. *(See,* 1973 NY Legis Ann, at 35; *Matter of Joyce T., supra,* 65 NY2d, at 47-48.) This is not such an example of unnecessarily continued foster care. This is a situation where long-term foster care is necessary due to external reasons beyond the parent's control. It is also an instance when long-term foster care is feasible, despite the legislative presumption against it,

because of the extenuating circumstances and because it also serves the interests of the children.

Technically, the best interests of the child is not the applicable standard in making an adjudication of permanent neglect, which centers only on proof of that statutory ground for termination of parental rights. *(See, Matter of Sanjivini K.,* 47 NY2d 374, 382.) Yet, it is impossible to determine parental unfitness because of failure to plan without evaluating how the plan meets the child's needs. The plan must incorporate "considerations of how the child will be supported financially, physically and emotionally." *(Matter of Leon RR,* 48 NY2d 117, 125.) While I can understand, therefore, the majority's reference to the best interests of the child, I cannot, however, accept its statement said with such conviction that: "It is clear that the best interests of the children lie with termination of the father's rights."

This conclusion wholly ignores the emotional damage that will result when these children's relationship with their father is irrevocably terminated in order to provide them with the legal distinction of an adoptive home with their foster parents, as opposed to continued long-term care with their foster parents. In so doing, this court is extinguishing a parental relationship, not because of this father's unwillingness to care for his children, not because of any lack of mental capacity to provide his children with guidance, emotional support and love, nor because he is abusive or otherwise harmful to his children. In other words, there is no termination because the parental relationship is injurious to the children. Rather, there is termination because for external reasons beyond respondent's control, although he can be a father to his children, he cannot be a home provider. The statute precludes termination in such an instance (Social Services Law § 384-b [7] [a]) and does not prohibit a plan of long-term foster care.

The majority seems also to ignore that we are not dealing with young infants who have not yet developed a relationship with their father. We are dealing with a 9 and a 13 year old who have an established, albeit restricted, relationship with their father, which this court appears to minimize. In an opinion supported by substantial research data, Family Court Judge Gertrud Mainzer spoke eloquently and convincingly of the psychological harm to an older child in terminating the child's bond with his or her parent because of adoption:

"In addition, there has been an increase in the number of foster children now being adopted by their foster parents. Many of these children have lived in foster care for extended periods, are older and have physical or mental handicaps. In these adoptions, secrecy is not only frequently impossible, but often inadvisable since these children remember their past and have emotional ties to their birth families.

"Research by psychiatrists and psychologists has also revealed the importance of a child's link to known ancestral, religious, ethnic and cultural backgrounds. Recent studies indicate that shrouding a child's background in an air of mystery, even for a child adopted at birth, can cause psychological harm, retarding emotional development and self-identity. Moreover, in a longitudinal investigation of foster care, Professors David Fanshel of Columbia University and Eugene B. Shinn of Hunter College found that the intellectual, psychological and physical development of children in long-term foster care was enhanced by visitation and contact, however minimal, with the biological family". *(Matter of Anthony,* 113 Misc 2d 26, 29-30.)

Long-term foster care cannot be categorically ruled out. In fact, its feasibility has already been recognized. In *Matter of Nicole TT. (supra,* 109 AD2d, at 920), where the children were found to be permanently neglected due to the mother's failure to plan for them, the Third Department noted that long-term foster care was still an option open to the Family Court at the dispositional hearing as possibly serving the children's best interests. In *Matter of Joyce T.* (65 NY2d 39, *supra)* the mother was determined to be incapable of caring for her child due to her mental retardation. (Social Services Law § 384-b [4] [c].) Under the facts before it, the Court of Appeals rejected long-term foster care as in the best interests of the child, but noted that while separate dispositional hearings for termination proceedings based on mental retardation are not required as they are in permanent neglect proceedings, it would not rule out that there might be an appropriate case of termination based on mental retardation where the Family Court should order a dispositional hearing to consider long-term foster care *(supra,* at 46).

At the very least, if this court is to order termination of respondent's parental rights and authorize release of his children for adoption, it must, on behalf of the best interests of these children, direct that hearings be held as to whether

their interests would be served by an "open adoption". *(Matter of Joyce T., supra,* at 46-47, n 2; *Matter of Anthony, supra,* at 28-32.)* In this day, where the incidence of children living apart from at least one parent is so high and where courts frequently enter orders directing visitation with a noncustodial parent, at times even against the wishes of the custodial parent, then, in an adoption, a relationship created by the State, not nature, we can certainly require the adoptive parent to continue to allow the child to maintain contact with his or her father or mother, if that will serve the best interests of that child.

For these reasons, I cannot join in the majority's decision to terminate respondent's parental rights.

ELLERIN, J. (concurring in part and dissenting in part). In this case I believe the record amply sustains the majority's conclusions that the agency fulfilled its statutory obligation and exerted the requisite "diligent efforts", both before and after the respondent's incarceration which commenced on April 10, 1979, and that the father failed to fulfill his duty to plan for the future of these children both before and after his incarceration.

I find untenable the dissent's position that the father's incarceration, which will extend for a period long beyond the children's reaching majority, makes it impossible for him to devise a realistic plan for return of the children to the home and he is therefore relieved of that obligation and the children must be continued in long-term foster care so that he can "preserve his parental right to maintain contact with them and thereby fulfill his parental duty to love, guide and provide them with emotional support".

While the statutory changes regarding the rights of an incarcerated parent were enacted with the most commendable intentions, the drafting of those changes leaves something to be desired and may be said to provide some basis for the interpretation enunciated by the dissent which was also the interpretation reluctantly adopted by the trial court. In so doing, the Trial Judge sadly observed that "In attempting to be fair to the prisoner who might some day be able and willing to care for his or her own child once again, the State Legislature may have sentenced this child to a life without any chance to have a real family" *(Matter of Delores B.,* 130 Misc 2d 484). That court further noted that its interpretation of the statutory changes within the context of the facts of this

case "lead[s] to the conclusion that adoption can be prevented by a prisoner who expresses real interest in his child and maintains contact insofar as possible although he has never been and can never be a real parent no matter how great his desires" *(supra,* at 485).

This interpretation of the statutory changes is in sharp conflict with the priority given in Social Services Law § 384-b to permanence in a child's life because of the Legislature's determination that "a normal family life in a *permanent* home offers the best opportunity for a child to develop and thrive" and its concomitant finding that "unnecessarily protracted stays in foster care deprive children of positive, nurturing family relationships" so that "in this State, foster care is viewed as a temporary way station to adoption or return to the natural parents, not the purposeful objective for a permanent way of life". *(Matter of Joyce T.,* 65 NY2d 39, 47-48.) In my view, these overriding considerations argue most persuasively for the position taken by the majority as to the standard of "planning" which is still imposed upon an incarcerated parent and the termination of parental rights which may stem from the parent's failure to meet that standard.

Notwithstanding my agreement with the decision terminating the father's parental rights and thereby freeing both of these children for adoption so that they may finally have the security and benefits of a stable home existence, this case does raise serious and troubling concerns regarding the potential for emotional harm if all contact with the biological father is terminated. Significantly, the infant Willie is now almost 13 years of age, and Delores is almost nine years old and for a substantial part of their lives they have had an ongoing relationship with their father by way of visits to him and letters from him. The emotional and psychological consequences stemming from complete abrogation of all ties with the natural family, particularly in the case of older children, and the benefits to the child from even minimal contacts with the biological parent are persuasively articulated, and documented, in the case of *Matter of Anthony* (113 Misc 2d 26), cited and quoted from in the dissent. *(See also, Matter of Joyce T., supra,* at 46-47, n 2, and authorities therein referred to.)

The facts before us indicate that serious consideration must be given to whether the termination of parental rights here should be coupled with provision for the continuation of some contacts between these children and their biological father. Ideally, such an arrangement would permit each child to

enjoy the stabilizing benefits of a permanent family and home setting while, at the same time, allow the children to receive the positive emotional support that comes from knowing that their biological father too is concerned about their future and that the termination of parental rights was not the result of his willful rejection or abandonment of them. Realistically, however, this record does not provide a sufficiently developed factual predicate to enable this court to fashion meaningful directions for continued contacts with the father which will truly be in the best interests of each child. Before such provision can be made, an appropriate hearing at the trial level is required to explore the myriad factors relevant to each child's best interests in this context, including any negative impact which such contacts may have upon the child's relationship with the adoptive family unit.

Accordingly, I would modify both of the orders entered by this court only to the extent of adding a provision in each case directing that a hearing be held in conjunction with any adoption proceedings to determine whether the child's best interests will be served by providing for some continued contacts with the biological father and, if so, the nature and extent of such contacts, taking into consideration the circumstances of the adoptive family and adjusting the frequency of any continued personal visits to the father, if such are deemed advisable, so that they are not unduly burdensome.

MURPHY, P. J., and KUPFERMAN, J., concur with SMITH, J.; CARRO, J., dissents in an opinion; ELLERIN, J., concurs in part and dissents in part in a separate opinion.

Order, Family Court of the State of New York, New York County, entered on December 12, 1985, reversed, on the law and the facts, the petition granted and the matter remanded for a dispositional hearing, without costs and without disbursements, and an order of said court, entered on February 28, 1986, affirmed, without costs and without disbursements.