OPINION OF THE COURT
Alexander, J.
The common issue presented on these appeals is whether the evidence adduced in each case supported a finding that the incarcerated parent "permanently neglected” his child within the meaning of Social Services Law § 384-b (7) (a), thus justifying the termination of his parental rights and the concomitant freeing of his child for adoption. For the reasons that follow, we conclude that the termination of parental rights was, in each case, proper and supported by clear and convincing evidence.
I

Matter of Gregory B.

Evidence was presented at the fact-finding hearing that respondent father has been incarcerated since August 1980 and is currently serving a prison sentence of 10 to 20 years at Green Haven Correctional Facility upon his felony conviction. His children, Gregory and Kareem, were born on December 28, 1979 and November 20, 1980 respectively. Should respondent serve the maximum term imposed, his children will be well into their majorities by the time of his release.[1] Gregory, now 9 years old, and Kareem, now 8 years old, entered foster care on October 24, 1981 pursuant to voluntary placement agreements executed by their mother placing them under the supervision of petitioner St. Dominic’s Home, an authorized child care agency. Petitioner placed Gregory and Kareem, along with their older half-brother Quaron,[2] in the same foster family with whom all three boys have resided since November 1981. Although it appears that Gregory and Kareem suffer from various physical and psychological maladies, with Kareem having required periodic hospitalization for an asthmatic condition, both children continue to thrive in their original foster home and their foster parents apparently wish to adopt them.
In July 1986, petitioner filed petitions in Family Court *83 under Social Services Law § 384-b (7) seeking to terminate the rights of both biological parents on the ground of permanent neglect and to free the children for adoption. At the fact-finding hearing petitioner presented evidence of having actively encouraged and nurtured the parent-child relationship by arranging numerous visits between respondent and his children at prison and by attempting to secure the assistance of relatives offered by respondent as possible custodians for Gregory and Kareem. Respondent’s initial plan was to have the children live with his mother until his release from prison. In a foster care review proceeding held in 1985, however, it was determined that discharge of the children to their paternal grandmother was not a viable option because she was neither physically nor emotionally up to the task of raising two young children with Gregory’s and Kareem’s special needs. No appeal was taken from this ruling. When advised of the court’s decision, respondent’s only alternative plan was to have his children remain in foster care until his eventual return to society.
Based on this evidence, Family Court concluded that the children had been permanently neglected by both parents "despite the agency’s efforts to nurture all available familial resources” and specifically noted that "[t]he term of imprisoned parents must be a factor in evaluating the viability of their plan for the future of their children”. After holding a dispositional hearing at which it concluded that the best interests of both children would be served by the termination of parental rights, the court terminated the parental rights of both biological parents and transferred guardianship and custody of the children to petitioner and the Commissioner of Social Services for the purpose of adoption. On respondent’s appeal from Family Court’s order, the Appellate Division affirmed, without opinion.[3]

Matter of Willie John B.

Matter of Delores B.

Evidence was presented at the joint fact-finding hearing that respondent father has been incarcerated since April 1979 and is currently serving two concurrent sentences of 25 years to life for murder at the Green Haven Correctional Facility. His children, Willie and Delores, were born on August 10, *84 1975 and August 16, 1979 respectively. Willie, who is now 13 years old, has been in the care of petitioner Cardinal McCloskey Children’s and Family Services since July 1, 1977 and his foster parents wish to adopt him; Delores, now 9 years old, has been in the care of petitioner since July 31, 1980 and her foster parents wish to adopt her also. The minorities of both children will be over if and when respondent is finally released from prison.
In June 1984, petitioner instituted two separate proceedings in Family Court to terminate the parental rights of respondent and to free the children for adoption.[4] It was established at the fact-finding hearing that petitioner was diligent in its efforts to foster the parent-child relationship by bringing the children to prison to meet with their father and by contacting relatives who might be able to care for the children. Petitioner’s efforts to assist respondent secure a permanent home for the children, however, proved futile because the relatives contacted — respondent’s two sisters and his mother — were either unwilling, unable, or ill-suited to the task of raising Willie and Delores. The only other plan respondent offered, like that of the respondent in Matter of Gregory B., was to keep his children in foster care until such time as he might be released from prison.
Notwithstanding respondent’s failure to provide either Willie or Delores with a realistic alternative to foster care, Family Court dismissed the petition relating to Delores, concluding that respondent did all he could in light of his status of incarceration to maintain contact with and plan for the future of his daughter. The court reasoned that the 1983 statutory reforms pertaining to incarcerated parents — precluding a court from terminating parental rights solely on the basis of incarceration — compelled the conclusion that "adoption can be prevented by a prisoner who expresses real interest in his child and maintains contact insofar as possible although he has never been and can never be a real parent no matter how great his desires” (Matter of Delores B., 130 Misc 2d 484, 485). With respect to Willie, however, the court made a finding of permanent neglect, concluding that even prior to his incarceration respondent had failed to plan for Willie’s *85 future. After a dispositional hearing, the court terminated respondent’s parental rights in respect to Willie and transferred guardianship and custody of Willie to petitioner and the Commissioner of Social Services for the purpose of adoption.[5]
A majority of the Appellate Division reversed the order of Family Court dismissing the petition relating to Delores, concluding that court had erred in determining that the 1983 statutory reforms precluded a finding of permanent neglect by the incarcerated father. The Appellate Division therefore granted the petition and ordered that the matter be remitted to Family Court for a dispositional hearing. On remand, Family Court adjudged Delores to be a permanently neglected child, terminated respondent’s parental rights in respect to her, and authorized petitioner and the Commissioner of Social Services to consent to her adoption. In respect to Willie, the Appellate Division majority affirmed Family Court’s order, concluding that the record evidence supported that court’s finding of permanent neglect.
Justice Ellerin, concurring in part and dissenting in part, agreed with the majority that the evidence supported a finding of permanent neglect as to both children but questioned whether, in light of the potential emotional harm that might result from a permanent severing of ties between the children and their biological father, "the termination of parental rights here should be coupled with provision for the continuation of some contacts between these children and their biological father” (141 AD2d 100, 117). Noting that the record in the case was not sufficiently developed to permit the court to decide what type of continuing contacts, if any, might be appropriate, Justice Ellerin suggested that there should be a hearing held in conjunction with any future adoption proceedings "to determine whether the child’s best interests will be served by providing for some continued contacts with the biological father and, if so, the nature and extent of such contacts” (141 AD2d, at 118, supra).
Justice Carro dissented separately, concluding that respondent’s incarceration imposed "an external impossibility on his ability to provide a home for his children” and therefore *86 precluded a finding of permanent neglect (141 AD2d, at 112, supra). Justice Carro reasoned that respondent did not seek to abdicate his parental obligations but merely sought to fulfill them "through a combination of meaningful contacts with his children and long-term foster care” and that such long-term foster care was a viable option under the statutory scheme in the circumstances presented (141 AD2d, at 113-114, supra). Justice Carro argued further that if termination of parental rights is indicated, then hearings should be held to determine whether the best interests of the children would be served by "open” adoptions permitting continuing contacts between the children and their biological father.
In Matter of Gregory B., leave to appeal was granted to respondent by an order of this court. In Matter of Willie John B. the appeal is here as of right on the two-Justice dissent at the Appellate Division (CPLR 5601 [a]). In Matter of Delores B., respondent appeals pursuant to CPLR 5601 (d) from the judgment of Family Court terminating his parental rights which judgment brings up for review the prior order of the Appellate Division reversing Family Court’s order dismissing the petition and remanding for a dispositional hearing. We now affirm in all three cases.
II
Before an order may be entered terminating parental rights upon the ground of permanent neglect, "the statute requires proof before Family Court that [the parent] failed to maintain contact with or plan for the future of [his or her] child for a period of one year after the child came into the custody of an authorized agency notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship” (Matter of Star Leslie W., 63 NY2d 136, 140; Social Services Law § 384-b [7]). The threshold determination to be made in any neglect proceeding, of course, is whether the child care agency exercised diligent efforts to strengthen and nurture the parent-child relationship (Matter of Jamie M., 63 NY2d 388; Matter of Sheila G., 61 NY2d 368). "Those efforts must include counseling, making suitable arrangements for visitation, providing assistance to the parents to resolve or ameliorate the problems preventing discharge of the child to their care and advising the parent at appropriate intervals of the child’s progress and development” (Matter of Star Leslie W., 63 NY2d, at 142, supra).
*87 Here, the record amply supports the determinations of the lower courts that the respective petitioners fulfilled their statutory obligation to nurture the parent-child relationship; in each case, the agency arranged for visitation between respondent and his child, communicated with respondent and kept him apprised of his child’s progress, and assisted respondent in formulating a plan for his child’s future. The requirement of due diligence by the agency having been satisfied, therefore, the focus of our analysis turns to an examination of the individual efforts of each respondent to maintain contact with and plan for the future of his children.
As we noted in Matter of Star Leslie W. (63 NY2d, at 142-143, supra), "[t]he requirement is several: the parent must maintain contact with the child and also realistically plan for [his or her] future. A default in performing either may support a finding of permanent neglect” (see, Matter of Orlando F., 40 NY2d 103, 110). Although both respondents in the instant appeals clearly satisfied the contact requirement of the statute by periodically meeting with their children at their places of incarceration and by communicating with the social workers assigned to their respective cases, the lower courts determined that they had each failed to adequately plan for the future of their children. "[T]he planning requirement contemplates that the parent shall take such steps as are necessary to provide a home that is adequate and stable, under the financial circumstances existing, within a reasonable period of time. Good faith alone is not enough; the plan must be realistic and feasible” (Matter of Star Leslie W., 63 NY2d, at 143, supra). Whether or not the planning requirement will be deemed satisfied will, of course, vary depending on the facts and circumstances which, we have noted, "must be scrutinized and weighed carefully in rendering decisions in such delicate human affairs” (Matter of Orlando R., 40 NY2d, at 111-112, supra).
In each of the instant cases, respondent’s initial plan was to place his children with a relative pending his release from prison. In Matter of Gregory B., respondent sought to place his children with his mother; in Matter of Willie John B. and Matter of Delores B., respondent first sought to place his children with his sister and then attempted to contact another sister before turning to his mother as a possible custodian for the children. When these plans proved unworkable, the only other plan offered by each respondent was to keep his children *88 in foster care while maintaining contact with them during the period of incarceration. Such plan, however, was rejected by the Appellate Division in each case as being neither viable nor realistic.
On these appeals, respondents argue that the 1983 statutory reforms precluding the termination of parental rights based solely on the fact of incarceration do not permit a court to make a finding of permanent neglect where an incarcerated father has maintained contact with his children but simply does not have the family resources to provide a realistic alternative to foster care during the period of his incarceration. Thus, respondents contend, the lower courts erred in terminating their parental rights merely because they could not produce a relative who was willing and able to care for their children while they remained in prison. We disagree.
Until the Legislature amended the Social Services Law in 1983, an incarcerated parent was presumed unable to maintain contact with or plan for the future of his child and thus a finding of permanent neglect while the parent was incarcerated was precluded (see, Social Services Law former § 384-b [7] [d] [ii]). Yet, although the incarcerated parent was excused from the contact and planning requirements of the statute, the consent of such parent was not required before his or her child could be released for adoption (see, Domestic Relations Law former § 111 [2] [d]). To correct this anomaly in the statutory scheme and to prevent the automatic termination of parental rights of incarcerated persons, the Legislature changed the law by removing the status of incarceration as a basis for the termination of parental rights and by recognizing the continuing parental obligations of incarcerated parents to their children (see, Social Services Law § 384-b [7] [d], as amended by L 1983, ch 911, §§ 2, 3; Domestic Relations Law § 111 [2], as amended by L 1983, ch 911, § 4; Correction Law § 619, added by L 1983, ch 911, § 5; Mem of Executive Department, Council Children and Families explaining purpose of L 1983, ch 911, 1983 McKinney’s Session Laws of NY, at 2706; Mem of Governor Cuomo approving L 1983, ch 911, 1983 McKinney’s Session Laws of NY, at 2816). The amended law requires the incarcerated parent to cooperate with the authorized child care agency in planning for the child and in arranging visits and further requires the agency to exercise diligent efforts to arrange visitation between the child and the incarcerated parent within the correctional facility (see, Social *89 Services Law § 384-b [7] [e] [ii]; [f] [5]; see also, Correction Law § 619).
In its findings accompanying the statutory reforms, the Legislature declared: "A parent who has been incarcerated should also fulfill, while actually incarcerated, the obligations of a parent as described in the provisions of section three hundred eighty-four-b of the social services law relating to the termination of parental rights upon the ground of permanent neglect. However, such ground of permanent neglect should recognize the special circumstances and need for assistance of an incarcerated parent to substantially and continuously or repeatedly maintain contact with, or plan for the future of his or her child. An incarcerated parent who has failed to fulfill these obligations may have his or her. parental rights terminated upon such ground” (Legislative findings, L 1983, ch 911, § 1 [emphasis supplied]). It is plain from these findings that the enacted reforms were in no way intended to excuse incarcerated parents from the requirement that they plan for their child’s future. To the contrary, the statutory amendments explicitly recognize the planning responsibilities of incarcerated parents and state that the failure to meet those responsibilities may result, as with any other parent, in the termination of parental rights.
It is true that the Legislature acknowledged the "special circumstances” of an incarcerated parent and intended that those circumstances be considered in evaluating such parent’s efforts to meet the statutory contact and planning requirements. Certainly, in light of the drastic consequences of failing to plan, courts should not set unrealistically high standards in evaluating a parent’s planning efforts (see, Matter of Orlando F., 40 NY2d, at 111, supra) and this directive undoubtedly applies with special force in cases where the parent is incarcerated and thus severely hampered in the ability to act on behalf of his or her child. This does not mean, however, that the Legislature intended to approve a plan of indefinite foster care for the child of an incarcerated parent who is serving a lengthy prison term and who cannot provide the child with an alternative living arrangement. Although the statutory scheme favors keeping a child with the natural parent where practicable and stresses the importance of exercising diligent efforts to foster and maintain the cohesiveness of the family unit, "permanence in a child’s life also has been given a priority, because the Legislature has determined that a normal family life in a permanent home offers the best opportu *90 nity for a child to develop and thrive” (Matter of Joyce T., 65 NY2d 39, 47; Social Services Law § 384-b [1] [a]). Thus, we have acknowledged that a primary purpose of the statute is to provide "a fair and timely basis to free a child for adoption” and that "[w]hen it is clear that natural parents cannot offer a normal home for a child, and 'continued foster care’ is not an appropriate plan, the statute directs that a permanent home be sought” (Matter of Joyce T., 65 NY2d, at 47, supra; Social Services Law § 384-b [1] [a] [i], [iv]).
As we explained in Matter of Joyce T. (65 NY2d, at 47-48, supra [emphasis supplied]): "[T]he Legislature in section 384-b clearly did not contemplate foster care as a permanent condition, or even a desired goal for the long, indefinite duration, because prolonged foster care is not in a child’s best interests. The Legislature found that unnecessarily protracted stays in foster care deprive children of positive, nurturing family relationships, and therefore — by section 384-b — it provided timely procedures for termination of parental rights, thus furthering the best interests, needs and rights of the child by freeing the child for adoption. In connection with parental termination, in this State, foster care is viewed as a temporary way station to adoption or return to the natural parents, not the purposeful objective for a permanent way of life.” In light of the plainly expressed understanding of the Legislature regarding the specific, limited role of foster care and the special importance of permanency in the life of a child, we conclude that an incarcerated parent may not satisfy the planning requirement of the statute where the only plan offered is long-term foster care lasting potentially for the child’s entire minority. Put simply, relegating a child to foster care until he or she is no longer a child is not a viable plan because it is patently inconsistent with the purpose of foster care and, more importantly, it deprives the child of that quality of "permanency” found by the Legislature to be so essential to proper growth and development.
Finally, we are not unmindful of the psychological harm that may possibly result from severing the bonds between a child and his or her biological parent, particularly where the child is older and has strong emotional attachments to the birth family (see, Matter of Joyce T., 65 NY2d 39, 46, n 2, supra; see generally, Matter of Anthony, 113 Misc 2d 26). Such concerns have been increasingly well documented in recent years, prompting some to advocate "open” adoptions in which *91 the court supplements an order of adoption with a provision directing that the adopted child have continuing contacts and visitation with members of his or her biological family (see, Matter of Anthony, 113 Misc 2d 26, supra; see generally, Davis, Use and Abuse of the Power to Sever Family Bonds, 12 NYU Rev of L & Social Change 557; Amadio and Deutsh, Open Adoption: Allowing Adopted Children to "Stay in Touch” with Blood Relatives, 22 J Fam L 59).
We express no opinion as to whether such contacts generally would be helpful and appropriate once parental rights have been terminated and the child has been adopted into a new family or whether a court should have the discretionary authority to order such contacts. We note, however, that the "open” adoption concept would appear to be inconsistent with this State’s view as expressed by the Legislature that adoption relieves the biological parent "of all parental duties toward and of all responsibilities for” the adoptive child over whom the parent "shall have no rights” (Domestic Relations Law § 117 [1] [a]; Matter of Best, 66 NY2d 151). Although adoptive parents are free, at their election, to permit contacts between the adopted child and the child’s biological parent, to judicially require such contacts arguably may be seen as threatening the integrity of the adoptive family unit. In any event, "open” adoptions are not presently authorized. If they are to be established, it is the Legislature that more appropriately should be called upon to balance the critical social policy choices and the delicate issues of family relations involved in such a determination.
Accordingly, the orders of the Appellate Division in Matter of Gregory B. and Matter of Willie John B. should be affirmed, without costs; in Matter of Delores B., the judgment appealed from and the order of the Appellate Division brought up for review should be affirmed, without costs.
Chief Judge Wachtler and Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur.
. In Matter of Gregory B. and Matter of Willie John B.: Order affirmed, without costs.
In Matter of Delores B.: Judgment appealed from and order of the Appellate Division brought up for review affirmed, without costs.

. Respondent will not become eligible for parole until June 1990.

. Respondent is not the father of Quaron who already has been adopted by the foster family.

. The mother has not appealed from Family Court’s order terminating her parental rights.

. The mother was not a party to the proceedings. It appears that she executed a surrender for Willie’s adoption in May 1981 and subsequently had her parental rights relating to Delores terminated by order of Family Court in September 1983.

. Family Court also ordered a specific psychological evaluation of Willie to determine whether visits between Willie and respondent would be helpful to Willie and, further, directed that there be visitation between Willie and Delores until such time as Willie is adopted.