Gregory B. v Administration for Children's Servs. (2005 NY Slip Op 25249)

Gregory B. v Administration for Children's Servs.

2005 NY Slip Op 25249 [8 Misc 3d 894]

April 27, 2005

Porzio, J.

Family Court, Richmond County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 07, 2005

[*1]
Gregory B., Petitioner,
v
Administration for Children's Services et al., Respondents.
Family Court, Richmond County, April 27, 2005

APPEARANCES OF COUNSEL

Gregory B., petitioner pro se. Legal Aid Society, Staten Island (Lori Landowne of counsel), for Jacqueline S. John Eyerman, New York City, for Seaman's Society for Children and Families.

OPINION OF THE COURT

Ralph J. Porzio, J.

Procedural History

On September 20, 2004 petitioner, Gregory B. (hereinafter referred to as grandfather), filed this petition for the custody of his paternal granddaughter, Jacqueline S., date of birth April 4, 1991.
The Administration for Children's Services (hereinafter referred to as ACS) filed a petition against M.P. (hereinafter referred to as mother) on March 14, 2003 alleging she was using drugs. On April 4, 2003, after an inquest, a finding of neglect was entered against the mother and on May 7, 2003, after a dispositional hearing, Jacqueline was placed with ACS.
On or about October 5, 2004 Seaman's Society for Children and Families (hereinafter referred to as the agency) filed a petition for the termination of parental rights of the mother and G.B. (hereinafter referred to as father).
On February 10, 2005, after an inquest, this court made findings of abandonment against the mother and father and after a dispositional hearing their rights were terminated.
An in camera of the child was held on January 13, 2005 and again on March 7, 2005.
Trial for the custody of Jacqueline was commenced on February 10, 2005 and concluded on March 15, 2005.
The agency and the Law Guardian opposed the grandfather's application for custody and made applications for a concurrent plan of independent living and adoption for Jacqueline.

Facts

The grandfather testified that he became aware he had a granddaughter when the child was approximately nine years old. Thereafter, he began seeing his granddaughter on a weekly basis.
[*2]
Jacqueline was initially paroled to her mother in March 2003. However, the mother absconded with Jacqueline and a warrant was issued for the mother to produce Jacqueline. On or about April 16, 2003 Jacqueline was dropped off at the grandfather's home by an aunt. The warrant was vacated and ACS conducted an expedited home study of the grandfather. His home was approved and Jacqueline remained with her grandfather until September 2003 when there was a brief trial discharge of Jacqueline to her father. On or about February 27, 2004 Jacqueline was returned to the grandfather.
The grandfather testified that he was unaware that his 13-year-old granddaughter was pregnant. The grandfather felt that his lack of knowledge of Jacqueline's pregnancy contributed to the difficulties that arose between them. He testified: "She [Jacqueline] was pregnant when she came back to me and the dialogue that we had was still based on my previous relationship" (transcript, Feb. 10, 2005, at 67, lines 9-11).
The grandfather testified he lives a very regimented life with rules and regulations which he feels Jacqueline does not like. He testified: "Well, because a thirteen year old with a child or without a child seeking the path of least resist[a]nce they don't want to be with somebody that's going to give them rules, regulations and guidelines to go by and Jackie knows that I have a very regimented life" (transcript, Mar. 15, 2005, at 61, lines 11-16).
When Jacqueline began acting out, the grandfather turned to the agency for help. He testified that he never threw her out of the house and that the agency, in April 2004, advised him that Jacqueline would be removed from him for only two weeks. He adamantly testified that he always believed that Jacqueline would be returned to him after that two-week period. Jacqueline was then placed with the agency.
On December 2, 2004, 13-year-old Jacqueline gave birth to a boy, Rahmel S.
The grandfather testified that he desires custody of Jacqueline and that he can provide the resources that she requires to succeed in life. He lives in a two-bedroom apartment in the Bronx. The second bedroom is Jacqueline's room. 
The grandfather is a veteran of the Vietnam War and receives a monthly allotment. The grandfather testified as to the large support network he has including his church, family, and neighborhood. Additionally, he is the founder and executive director of a nonprofit corporation for housing.
When questioned regarding his ability to care for Jacqueline, the grandfather very candidly testified:
"the court: You think you are better equipped now to be the custodian of Jackie than you were when she was running around if you will.
"the witness: Yes and no to be perfectly honest." (Transcript, Feb. 10, 2005, at 73, lines 12-16.)
The grandfather went on to explain that he feels he is equipped to take care of Jacqueline and her child but is concerned about his reaction to her relationship with the father of her child who has never been identified but is believed to be a significantly older man.
Medically, the grandfather suffers from severe open angle glaucoma which impairs his vision. He feels it will not affect his ability to care for his granddaughter.
Finally, the grandfather testified that no matter what the decision of this court he would continue to see his granddaughter and foster their relationship. He testified that he had developed a relationship with Jacqueline's current foster mother, Ms. Jackson, and thought highly of her.
[*3]
A caseworker for the agency, Ms. C.W., testified at trial that the agency's position was that Jacqueline remain in foster care with a concurrent plan of adoption and independent living. Ms. W. testified that Jacqueline had previously withheld her consent for adoption. However, at the service plan review on March 15, 2005, Jacqueline expressed an interest in being adopted.
Ms. W. testified that, although the agency's position was that Jacqueline should remain in foster care, she hesitated as to what she felt would be best for Jacqueline.[FN1] 

She testified that she would like to have more home visits with the grandfather and Jacqueline and witness more interactions between them.
During the in camera, Jacqueline stated that she would abide by this court's decision regardless of whether she would remain in foster care with a concurrent goal of independent living and adoption or return to the grandfather. Jacqueline understands that she cannot be adopted without her consent.[FN2] 

Prior to March 15, 2005, Jacqueline had withheld her consent. On March 15, 2005, Jacqueline, during her in camera, testified that she did want to be adopted by either the current foster mother, Ms. Jackson, or a cousin. However, adoption had not been discussed with Ms. Jackson and Jacqueline did not even remember the name of her cousin. Jacqueline further stated she loves her grandfather but feels they get along better when they are not residing together.
Jacqueline regularly attends school in Brooklyn where she is enrolled in a mother/child program. She also travels with her child via the subway for weekend visitation at the grandfather's home in the Bronx.
The Law Guardian and agency opposed the grandfather's application for custody. The Law Guardian stressed that when Jacqueline was acting out in the past the grandfather's solution was to throw her out of the house, a fact which the grandfather disputes vehemently.

Issue Presented

This court determined the following issue: whether it is in the best interest of a 14-year-old child to remain in foster care with a concurrent goal of independent living and adoption or whether the child's paternal grandfather should be granted custody.

Discussion

Pursuant to Social Services Law § 384-b, the health and safety of children is of "paramount importance" and that "it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive." (Social Services Law § 384-b [1] [a] [i].) Social Services Law § 384-b goes on to state: "when it is clear that the birth parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child." (Social Services Law § 384-b [1] [a] [iv].)
The New York State Court of Appeals articulated in Matter of Gregory B. (74 NY2d 77, 90 [1989]):
"Put simply, relegating a child to foster care until he or she is no longer a child is not a viable plan because it is patently inconsistent with the purpose of foster care and, more importantly, it deprives the child of the quality of 'permanency' found by the Legislature to be so essential to proper growth and development."
The grandfather testified credibly that he loves his granddaughter and great-grandson and will do whatever is best for them. He did not deny the fact that there would be obstacles. However, he has in place a support network to help him and his granddaughter.
Jacqueline needs stability. The grandfather is willing to work with his granddaughter to provide her with the stability and structure she needs to succeed in life. Accordingly, this court finds that it is in the best interest of Jacqueline that the grandfather's petition for custody be granted effective June 20, 2005 in order for Jacqueline to finish the current school year.
This court further finds that placing a 14 year old with an infant in foster care with a concurrent plan of independent living and adoption when a viable family resource is available goes against the very intent of Social Services Law § 384-b. Further, to allow Jacqueline to remain in foster care would essentially, as stated in Matter of Gregory B. (74 NY2d 77, 90 [1989]), deprive her of permanency.
Accordingly, the grandfather's petition for custody of Jacqueline is granted.

Findings and Decision

This court finds that custody to the grandfather is in the best interest of Jacqueline.

Footnotes

Footnote 1: On February 10, 2005, at the permanency hearing for Jacqueline, Ms. W. testified that although the agency's position was adoption she personally felt custody should be awarded to the grandfather.

Footnote 2: "Subject to the limitations hereinafter set forth consent to adoption shall be required as follows: (a) Of the adoptive child, if over fourteen years of age, unless the judge or surrogate in his discretion dispenses with such consent." (Domestic Relations Law § 111 [1] [a].)