OPINION OF THE COURT
Dandrea L. Ruhlmann, J.
This is a case of first impression where a nonrespondent incarcerated father and intervenor objects to a social services agency’s permanency goal of “Placement for Adoption” for his young son. In its statutorily-mandated permanency hearing report (report) dated August 8, 2007, petitioner Monroe County Department of Social Services (Department) reports that its new permanency goal for Sharu K. (date of birth Aug. 2002) is “Placement for Adoption.” Nonrespondent father and intervenor in the neglect proceeding Richard K. (father) objects to the goal and argues that it should remain instead “Return to Parent.” Respondent Melanie K. (mother) and the Law Guardian support a dual goal. The court modifies Sharu’s permanency goal as it relates to father to “Return to Parent.”
Facts
Father has been present in Sham’s life since his birth in August 2002. In 2003 both father and mother were granted joint custody of Sham and father had primary physical residency of Sham for a short time until residency was switched back to mother sometime in the Summer of 2003 after incidents of domestic violence.
On August 7, 2004 Sharu was removed from the home of mother. At the onset of the neglect proceeding respondent intervened and sought to have Sharu placed with him. Father also petitioned for full custody of Sharu. The court granted father weekly supervised visits with Sharu. By February 2005, father’s visitation became unsupervised; such visits went well until the summer of 2005 when another incident of domestic violence occurred and father was arrested for violating an order of protection issued to mother. Father continues to be incarcerated and Sharu remains in foster care. Three permanency *481 reports have been submitted in the meantime (dated Jan. 5, 2006; Jan. 22, 2007; and Aug. 7, 2007), with numerous court appearances. The Department filed a termination of parental rights (TPR) petition against father on June 26, 2007. A permanency hearing was scheduled for August 16, 2007 and in the report dated August 8, 2007, the Department sought to amend Sharu’s permanency goal to “Placement for Adoption.” Father objected to the amended goal and the permanency hearing was continued on September 19, 2007. Two witnesses testified at the permanency hearing including Department caseworker Tracy Montesano and father.
A. Caseworker Contact
Ms. Montesano has been employed with the Department for approximately one year. She has worked with both respondent and father since November 2006 while in training with the Department. Montesano and father both testified that their contact has been limited to letter communication. Five letters were received as respondent’s exhibits: the letters primarily address father’s visitation with Sharu although the Department’s final letter dated September 14, 2007 states “the American and Safe Families Act requires that we proceed with termination of parental rights when a child has been in foster care for 15 out of 22 months. Sharu has been in foster care since 3/06.” As of September 14, 2007, the Department’s TPR petition against father had already been filed for almost three months.
B. Release Date
Father has a conditional release date of April 2008. Father’s latest release date is August 2009. Father was denied parole in June 2007. Father testified that he is incarcerated currently at Orleans Correctional Facility, due to his conviction for violating his probation as he violated an order of protection issued in favor of mother. He received a 2 to 4 year sentence that is currently on appeal.
C. Visitation
Before father was incarcerated he received weekly unsupervised visitation. After incarceration, father was receiving weekly visitation at the Monroe County Jail where he was awaiting trial (report Jan. 5, 2006). When father was relocated out of county during the summer of 2006, the court provided visits for Sharu and father when father was produced to Monroe County for court appearances; the court nonetheless ordered that the Department provide monthly visits. Specifically, during appear *482 anees in October 2006, January, February and March 2007, the court reiterated that father was entitled to monthly visits with Sharu. By letter dated December 17, 2006 to the Department, father inquired about when he was going to visit with Sharu and indicated that he wished to be involved in planning for Sham’s future (respondent’s exhibit F). The report prepared January 22, 2007 indicates that “Sharu will begin visiting [father] in prison starting on 1/21/07” (at 10); yet by letter dated December 26, 2006 the Department, in response to father’s December 17, 2006 letter, states that both the December and January visits were cancelled. It is unclear when visits actually occurred. By letter dated June 7, 2007, father writes that he received a “five minute[ ]” visit with Sharu in April, 2007 but no May visit (respondent’s exhibit A). By letter dated August 8, 2007, father acknowledged that he had a visit that day with Sham (respondent’s exhibit E). The report dated August 7, 2007 indicates that monthly visits are arranged but
“some of the visits had to be cancelled due to severe weather conditions or if the foster parents already had plans for Sharu for the day that [the Department] was available [with transportation]. On one occasion [the transportation provider] and Sharu went to a visit and were not allowed into the prison.”
D. Services
The report dated January 5, 2006 states that “[father] has been told on several occasions it will be necessary for him to complete a men’s non-violence program as well as demonstrate consistency in maintaining contact with Sharu once he is released from jail” (at 5). It further states that father was receiving “service planning . . . regarding services needed to assist in reunification with his son, such as referrals/ recommendations to the men’s non-violence 26-week program” (at 8). The report summarizes however that father “is not able to complete recommended services while in jail as such services are not offered . . . Upon his release [from] jail, the caseworker will assist [father] in securing recommended services” (at 8).
The next report “prepared on 1/22/07” for a permanency hearing originally scheduled for July 2007 states that father needs to engage in services “mainly anger management, domestic violence and parenting classes and demonstrate an ability to safely, adequately care for his son in order for the Department to support reunification ... It will be important to determine *483 what, if any, services would be available to [father] during his incarceration” (at 5). “Based on [father’s] current incarceration status, the Department would support him engaging in services provided to him through the State prison system such as anger management, parenting and a men’s non-violence program” (report Jan. 22, 2007 at 8).
Father testified that he completed an anger management program (anger replacement training) — a prerequisite for any inmate. Ms. Montesano testified that although father completed such program, after completion he had prison infractions that resulted in him being sent to a special housing unit and later transferred to another prison. She testified that after father’s release from prison he would still need intensive anger management, to complete parenting and therapy as he has very severe emotional issues. Ms. Montesano testified that she spoke with father’s prison counselor Ms. Meldanado from Orleans Correctional Facility on June 21, 2007 and she told her that father has extreme anger issues and would need anger management counseling to effectively parent. Ms. Montesano testified that father was incarcerated at Maree, Collins and Orleans and she believes she has spoken to his counselors at all three facilities. Father testified that after he came out of the special housing unit he learned to avoid confrontations using aggression replacement training techniques. Since then he has had only one non-anger management infraction in prison.
E. Planning
Respondent offered two resources, Kathleen W and his sister Phyllis W Ms. Montesano testified that she spoke with Kathleen W. on September 13, 2007 and she indicated she would be a resource but only until father is released from prison to prevent father’s parental rights from being terminated. She indicated to Ms. Montesano that she did not want to be a permanent placement for Sharu. Respondent’s sister does not qualify as a resource because she has a criminal history and is allegedly an alcoholic.
Ms. Montesano testified that in order for father to be reunited with Sharu he needs to demonstrate that he can parent consistently and can stay out of prison. He would need to complete parenting and anger management programs and have monitored visitation with Sharu. She testified that she could not give a time frame for how long such reunification would take.
Father testified that he was incarcerated twice before: first, in 1990 for criminal possession of a controlled substance with *484 intent to sell when he served a three-year sentence, and second, in 1997 for second-degree robbery, serving four years in prison. Respondent testified that his past is not reflective of his future.
Statement of Law
Family Court has continuous jurisdiction from the day a child is placed in foster care until the date that permanency is achieved (Family Ct Act § 1088). Family Court must hold permanency hearings every six months when a child continues in an out-of-home placement (Family Ct Act § 1089 [a] [3]). The Department has the executive discretion to change its permanency goal and to file a petition for termination of parental rights but Family Court has the ultimate authority both to “approve [ ] or modifly]” the permanency goal (Family Ct Act § 1089 [d] [2] [i]) and to grant or deny the Department’s termination petition. One purpose of a permanency hearing is to audit, under a preponderance of the evidence standard, whether an agency is meeting its legal obligations and to review a parent’s compliance with the approved service plan (Matter of Tatiana R., 17 Misc 3d 443 [Fam Ct, Kings County 2007], citing Matter of Belinda B., 114 AD2d 70 [4th Dept 1986]). When a child is not returned to his parent, the court must find whether the permanency goal for the child should be approved or modified and the anticipated date for achieving the goal. The goal may be determined to be, inter alia, return to parent or placement for adoption with the local social services official filing a petition for termination of parental rights (Family Ct Act § 1089 [d] [2] [i] [A], [B]). The court must determine whether reasonable efforts have been made to effectuate the child’s permanency plan (Family Ct Act § 1089 [d] [2] [iii]; see Matter of Lafuorne B., 44 AD3d 653 [2d Dept 2007]). In the case of a child whose permanency goal is return to parent, the court must inquire whether the Department has made reasonable efforts both to eliminate the need for placement and to enable the child to return safely home.(Family Ct Act § 1089 [d] [2] [iii] [A]).
The court may direct the Department to “undertake diligent efforts to encourage and strengthen the parental relationship when it finds that such efforts will not be detrimental to the best interests of the child . . . Such efforts shall include encouraging and facilitating visitation with the child by the parent” (Family Ct Act § 1089 [d] [2] [viii] [F]). The court may also require the Department to make progress reports to the court, the parties and the child’s law guardian on the implementation of such order (Family Ct Act § 1089 [d] [2] [viii] [G]).
*485 There is no appellate authority guidance regarding a court’s findings after a permanency hearing held under Family Court Act § 1089. There is case law in the TPR arena however with a clear directive that not only must an incarcerated parent plan for the future of his child but that the Department must exercise diligent efforts in helping the incarcerated parent so plan. “[A]n incarcerated parent may not satisfy the planning requirement of the statute where the only plan offered is long-term foster care lasting potentially for the child’s entire minority” (Matter of “Female” V., 21 AD3d 1118, 1119 [2d Dept 2005] [the department established diligent efforts by, inter alia, facilitating visitation, keeping respondent advised of his children’s welfare and repeatedly reminding him of the need to find a resource], lv denied 6 NY3d 709 [2006], quoting Matter of Gregory B., 74 NY2d 77, 90 [1989]; Matter of Shawn O., 19 AD3d 238 [1st Dept 2005] [department not required to show diligent efforts to encourage and strengthen the parental relationship where respondent father did not cooperate]).
An incarcerated parent must have a “realistic and feasible” alternative to having his child remain in foster care until his release from prison (Matter of Love Russell J., 7 AD3d 799, 800 [2d Dept 2004] [department exercised diligent efforts by, inter alia, facilitating visitation, keeping the respondent advised of his children’s welfare and repeatedly reminding him of the need to find a resource]). This depends — of course — upon how long that parent will be incarcerated (Matter of Latasha F., 251 AD2d 1005 [4th Dept 1998], citing Matter of Carmen N, 237 AD2d 607, 608 [2d Dept 1997] [9 to 18 years’ imprisonment with child in foster care], Iv denied 90 NY2d 805 [1997]; Matter of Omar Garry G., 198 AD2d 149 [1st Dept 1993] [at least seven years in foster care], lv denied 83 NY2d 753 [1994]; Matter of Latasha C., 196 AD2d 756 [1st Dept 1993] [at least six years in foster care]). In Matter of Latasha F. (251 AD2d 1005 [1998]) the Appellate Division, Fourth Department, reversed a family court’s termination of respondent mother’s parental rights where the department filed a permanent neglect petition only 16 months before respondent’s earliest release date from prison. There, the department failed to exercise diligent efforts because it did not advise respondent that her plan to continue foster care pending her release was unacceptable and did not assist respondent in formulating a plan for her child’s future. The service plan there, as here, reflected only planned services for respondent after her release from prison.
*486 The Appellate Division, Second Department, in Matter of Baby Girl C. (1 AD3d 593, 594 [2d Dept 2003]) reached a contrary conclusion, finding that respondent father’s parental rights were properly terminated where he was unable to provide any “realistic and feasible” alternative to having his children remain in foster care until his earliest release date from prison, “some 16 months later.” Yet, in contrast to Matter of Latasha E, in Baby Girl C. the department therein exercised diligent efforts by, inter alia, keeping the father apprised of the children’s welfare during monthly telephone conversations, facilitating visitation, and referring the father for enrollment in the required programs during his incarceration and repeatedly reminding him of the need to find a resource for the care of his children.
The facts at issue herein are more similar to Matter of Latasha F. than to Matter of Baby Girl C. First, father’s earliest release date is less than six months away and his definite release date is in approximately 22 months. Second, the Department did not exercise diligent efforts. Although the court repeatedly ordered the Department to facilitate monthly prison visitation, it is unclear how many times father actually was offered visitation with Sharu. The visitation was offered sporadically at best and much of it occurred only because the court scheduled it on court appearance dates. Third, the permanency reports are not clear as to what services father needs to complete. While the first report requires only a men’s nonviolence program, later reports require additional services. More confusing, while the first report indicates that father will be referred to a nonviolence program after his release from prison, a later report indicates that the Department should investigate whether the available prison programs are adequate. Father never had a clear mandate of what was required for reunification with Sharu.
Compelling too, here father was not named as a respondent in the neglect proceeding. He never had a dispositional order requiring services, instead voluntarily chose to engage in services to be reunited with Sharu.
While the Department contends that father has not planned for Sharu’s future, father named Kathleen W as a resource as early as January 2007. The Department only recently (by a telephone conversation of September 13, 2007) determined that Ms. W would be willing to commit as a resource for Sharu until father’s release from prison. The Department argues that this is not a permanent resource for Sharu because Ms. W. will act *487 only until Sharu can be returned to father. As father’s release may be as early as six months away, the Department should explore this option. Even assuming that father would need to complete services after release from prison and demonstrate parenting skills through a period of monitored visitation, the placement need not be necessarily an extended one. In any event, Sham’s current foster parents have indicated that they do not wish to be adoptive resources for Sharu; thus Sharu at the present time is left without any permanent resource.
The court thus exercises its authority and modifies the Department’s permanency goal back to “Return to Parent” (Family Ct Act § 1089 [d] [2] [i]) and orders the Department to undertake diligent efforts to encourage and strengthen father’s relationship with Sharu (Family Ct Act § 1089 [d] [2] [viii] [F]). The Department must facilitate not less than monthly visitation between father and Sharu and shall document when such visits occur. The Department must follow up to ascertain whether the nonviolence program completed by father in prison satisfies their mandate, and if it does not shall refer father to an appropriate program immediately upon his release from prison. The Department must contact Ms. W to ascertain her willingness to act as a resource for father and shall explain contingent time lines depending on when father is released from prison and how long program completion may take. At the same time, the Department should research adoptive resources for Sharu. The court may adjudicate a particular goal yet direct the Department to engage in concurrent planning (Family Ct Act § 1089 [c] [4] [iii]; [d] [2] [iv]). The Department shall make a progress report to the court, the parties and the Law Guardian in eight weeks (Family Ct Act § 1089 [d] [2] [viii] [G]). The Department may proceed with its TPR petition but should be cognizant that its burden of proof in a TPR proceeding is clear and convincing evidence — a higher standard than preponderance of the evidence — the standard employed at this permanency hearing (see Matter of Tatiana R., supra).
Now, therefore, it is hereby ordered that the permanency goal for Sharu shall be return to parent (father); and it is further ordered that the Department submit a permanency planning order for father consistent with this decision.