[908 NYS2d 810]

In the Matter of ALICIA G., a Child under the Age of Eighteen, Alleged to be Permanently Neglected. HANNA MUHAMMAD et al., Respondents.

Family Court, Kings County, July 12, 2010

## APPEARANCES OF COUNSEL

*Wingate, Kearney & Cullen* (*Danielle Nicholson* of counsel), for petitioner. *Vivienne Hewitt* for Hanna Muhammad, respondent. *Joan James* for Al G., respondent. *Brian Zimmerman* for the child.

## OPINION OF THE COURT

Lee H. Elkins, J.

The petition filed August 12, 2008 by Heartshare Human Services alleges that during the time period from August 22, 2007 to August 12, 2008, the respondents Hanna Muhammad and Al G. permanently neglected (Social Services Law § 384-b [7] [a]) the child Alicia (d.o.b. 3/7/2006). Fact-finding commenced on May 29, 2009 and continued on October 5, 2009,[1] March 4 and April 8, 2010. Petitioner called five witnesses: Lydia King, case worker supervisor; Zahara Basir, case worker; Ianna Basil, case worker; the foster mother Ms. Myhand; and the respondent mother. The agency also introduced case records and records from the Bedford Hills Correctional Facility.

Findings of Fact

Alicia entered foster care at birth. The court remanded her to Administration for Children's Services on March 24, 2006 and Children's Services placed her with an authorized child care agency, Heartshare on March 26, 2006. The respondent mother had been a foster child, in the care of the petitioning agency in the same home as her older daughter Ky'syrah. She designated Ms. Myhand as a resource for Ky'syrah.[2] She considers Ms. Myhand her "stepmother." Shortly after Alicia's birth, the respondents were arrested together for an armed robbery. Both were convicted and the mother received a sentence with an

---

1. Efforts to mediate permanency for Alicia and her sister contributed to the delay. The mother executed a surrender for the older child, Ky'syrah.

2. The court takes notice of its order for the agency to place Alicia with Ms. Myhand in the context of permanency hearings, with the support of the law guardian.

early release date of 2010, and the father with an early release date of 2014. Ms. Muhammad arrived at Bedford Hills Correctional Facility on December 16, 2006, where she remained during the relevant time period. Mr. G. is incarcerated at Southport Correctional Facility.

Ms. King testified that the parents were incarcerated when she began supervising the assigned case workers in June 2007. The service plan for the mother, developed before her incarceration, was to complete parenting skills and anger management counseling and to have a mental health evaluation. Ms. King testified that the service plan was not modified after the mother's incarceration. Alicia was to visit the mother monthly. There were no visits scheduled for the father, due to the distance to the facility.

Ms. King never met or spoke to either parent. Ms. King testified that there were "so many workers," including three between August 2007 and August 2008. The three workers assigned to the case during the relevant period, included: Ms. Disla from August 2007 to January 2008; Ms. Basir from January to April 2008; and Ms. Basil from April 2008 to October 2008. The workers never wrote or spoke to the father or to the mother outside of the mother's visits. They would speak to the mother when escorting Alicia to visits, arranged through the Children's Services "CHIPPS" program. Another worker, Jennifer Watkins, occasionally escorted Alicia to visits with her mother. Ms. King would instruct the case workers to counsel the mother during these visits "regarding what she has to do to complete the service plan requirements." She also instructed them to call the prison to see what services, if any, that the agency required were given at the facility and whether the parents were compliant. Apparently, no worker ever successfully communicated with anyone from the prisons in regard to the parents' participation in services.

Ms. King testified that the father proposed his sister, Linda G., as a resource. According to Ms. King, Linda G.'s visits were sporadic and inconsistent. A case worker visited Ms. G.'s home. Ms. G. eventually conveyed to the agency that she was unwilling to take Alicia.

Ms. Basir testified that during the seven-month period she was assigned the case, from October 2007 until April 2008, the barrier to reunification was the mother's incarceration. Ms. Basir testified that the mother's service plan was to engage in individual therapy, comply with prescribed medication and

complete a parenting skills class. Ms. Basir testified that she visited Bedford Hills with Alicia five times[3] and "conveyed" the plan to the mother at the time of the visits. Although she did engage in discussions about services with Ms. Basir, Ms. Muhammad objected to having these discussions during the brief time she had to see her children, which amounted to less than two hours every month. There was no evidence of a service plan review, and if one were held no attempt was made to include the parents. According to Ms. Basir she understood that counseling was to be provided by the Department of Correctional Services. The mother told Ms. Basir that she was not in counseling or on medication because she "wasn't crazy." In October 2007, Ms. Muhammad said that she had not been in therapy or on medication since April 2007 and that she "didn't have to go." She informed Ms. Basir that she was enrolled in parenting classes. Ms. Basir did not attempt to determine whether the facility assessed the mother as needing therapy or medication. She did attempt to obtain a consent form to be signed by the mother so as to discuss the mother's participation in therapy and recommendation for medication with prison doctors. She had the mother's counselor[4] at Bedford Hills mail a copy of the consent form to her. However, she was unable to have Ms. Muhammad sign the consent form during the visits because the worker could not bring pen or paper into the prison. No effort was made to arrange a meeting with the mother and her counselor. Ms. Basir did not correspond or telephone Ms. Muhammad.

Ms. Basir testified that no visit occurred in September 2007 due to the case being in "transition." Two other visits did not occur due to an influenza outbreak at the prison. Ms. Basir recalled that she and the foster mother arrived at Bedford Hills to visit the mother on one occasion, only to be told that the mother was in "lockdown" and could not visit. According to Ms. Basir, the mother later stated that she had an altercation with another inmate, which restricted her visits. Significantly, the case worker described the respondent mother as affectionate and attentive during visits.

The father initially was incarcerated at the Clinton Correctional Facility. Ms. Basir never met with the father apart from a mediation session held at the courthouse via video conferencing.

---

3. Only two visits are reflected in the progress notes, however.

4. There is no documentation in the progress notes regarding contacts with the prison counselor.

Ianna Basil testified that she was assigned the case from April 2008 to October 2008. Ms. Basil testified that the mother's service plan was to complete a parenting skills class, to obtain psychiatric services and to engage in educational and vocational training. Ms. Basil testified that during the one visit she attended with Alicia and her mother between April and August 2008, she "informed" the mother about the plan and "tried to reach out to" the mother's prison counselor. However, she had no detailed recollection of the conversation. Ms. Basil did not meet the mother until July 2008, as she missed the first two visits scheduled during her tenure. Ms. Basil did not determine whether Bedford Hills offered the services the mother required or whether the mother was enrolled in any programs or treatment at Bedford Hills. In July 2008, the mother informed Ms. Basil that she was attending therapy and on medication, and was in parenting skills and vocational training. The mother stated that she missed some sessions. Ms. Basil admittedly did not contact Bedford Hills regarding services available to the mother. She could not recall sending letters to the mother's prison counselors. No conversation with the prison counselors is documented in the progress notes. The same was true of the father, with whom the case worker also had no correspondence or conversation.

Ms. Myhand testified that she has been Alicia's foster mother since birth. She testified that the father provided no support for Alicia. She took Alicia to see her father several times in 2007 while he was incarcerated on Riker's Island. During the same year, the father's sister Linda G. visited with Alicia in the foster home several times and brought her a gift. The father would send the foster mother letters and the foster mother sent the father photographs of Alicia.

The respondent mother, called by the petitioner, testified that she has resided at Bedford Hills since December 16, 2006. She did not receive any letters or calls from the agency. She was not aware of any service plan review during the relevant period. She acknowledged that therapeutic, parenting and vocational counseling were available to her. She conceded that some of the services she needed in order to have Alicia returned to her were provided by Bedford Hills and that to continue in programs she needed to have good behavior. Records of Bedford Hills in evidence reflect that Ms. Muhammad never refused to accept any recommended programs. The records show that the mother had a generally good assessment in December 2007, including enroll-

ment in a pre-GED program from which she graduated, and no significant disciplinary action. In the December 24, 2007 assessment the facility counselor noted the mother's positive attitude and noted that her goal was to finish programs and to go home to her children. Ms. Muhammad testified that upon her arrival she was enrolled in a MICA program from which she asked to be removed as she did not have a substance abuse problem. The records reflect that Ms. Muhammad was enrolled in a GED program and a computer repair program in mid-December.

Ms. Muhammad acknowledged that when her request to be removed from the computer repair program was refused she failed to attend, causing her removal for disciplinary reasons. This resulted in her removal from the GED program because she was required to remain in her cell for 15 days. Although she subsequently re-enrolled, she failed the test. She also had infractions on December 29, 2007, March 4, May 19 and August 16, 2008 for violent conduct. She acknowledged being removed from a parenting program for disciplinary reasons in March 2008. The respondent explained that the removal was pending a disciplinary hearing. The suspension lasted six days, according to the prison records. The mother asserted her innocence to the counselor who prepared the March 14, 2008 inmate review sheet. Ms. Muhammad testified that she rejoined the parenting group and obtained a certificate, received in evidence, in April 2008. The Bedford Hills records also show that Ms. Muhammad enrolled in aggression replacement training from May 19 until June 22, 2008, when she was removed for disciplinary reasons. The record reflects that Ms. Muhammad was removed from her GED program for the same reason. Ms. Muhammad testified that she enrolled in another parenting course, "Parenting from a distance," in July 2008. In the September 8, 2008 inmate review, the counselor notes that Ms. Muhammad is "working on" her "poor disciplinary adjustment," and that her goal is to choose her company wisely and to remain free of disciplinary infractions for the next several months. The respondent testified that the facility allowed her to have visits even when she was in "keylock" confined to her cell and in the special housing unit in January 2008.

As for compliance with therapy and medication, Ms. Muhammad testified that she met with a psychiatrist and therapist at Bedford Hills in October 2007 and that they agreed to take her off of medication and to discontinue therapy. Ms. Muhammad testified that she could see a therapist or psychiatrist at Bed-

ford Hills upon request. She testified that in July 2008 she was restored to medication and began therapy due to feeling depressed after she filed a written request.

Conclusions of Law

Social Services Law § 384-b (7) (a) provides that a child is permanently neglected when the parent fails

> "for a period of either at least one year or fifteen out of the most recent twenty-two months following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship."

Subdivision (7) (c) provides that

> " 'to plan for the future of the child' shall mean to take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative. In determining whether a parent has planned for the future of the child, the court may consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available to such parent."

For incarcerated parents, this includes services available within the penal institution. (*See e.g. Matter of Anastasia FF.*, 66 AD3d 1185 [3d Dept 2009]; *Matter of Shane I.*, 300 AD2d 709 [3d Dept 2002].)

As a threshold in any proceeding to establish permanent neglect, the agency must prove that it has met the statutory obligation to use diligent efforts to encourage and strengthen the parental relationship, notwithstanding the parent's incarceration. (*Matter of Gregory B.*, 74 NY2d 77 [1989].) However, diligent efforts in the context of incarcerated parents are different than efforts required for parents at liberty. Specifically, the Legislature has declared that whereas diligent efforts generally require provision of services and other assistance to the parents, so that problems preventing the discharge of the child from care may be resolved or ameliorated, there is an exception for

incarcerated parents. (Social Services Law § 384-b [7] [f] [3].) For example, the Court of Appeals observed in *Gregory B.* that the agency satisfied the diligent efforts requirement as to an incarcerated parent when it "arranged for visitation between respondent and his child, communicated with respondent and kept him apprised of his child's progress, and assisted respondent in formulating a plan for his child's future." (74 NY2d at 87.)

The Court of Appeals also declared in the context of planning by an incarcerated parent, that "[w]hether or not the planning requirement will be deemed satisfied will . . . vary depending on the facts and circumstances." (*Id.*) In analyzing the permanent neglect statute in the context of planning with an incarcerated parent, the Court of Appeals observed

> "that the Legislature acknowledged the 'special circumstances' of an incarcerated parent and intended that those circumstances be considered in evaluating such parent's efforts to meet the statutory contact and planning requirements. Certainly, in light of the drastic consequences of failing to plan, courts should not set unrealistically high standards in evaluating a parent's planning efforts (*see, Matter of Orlando F.*, 40 NY2d [103], 111, *supra*) and this directive undoubtedly applies with special force in cases where the parent is incarcerated and thus severely hampered in the ability to act on behalf of his or her child." (74 NY2d at 89.)

The Legislature's most recent pronouncement in this area (Social Services Law § 384-b [7] [a], as amended by L 2010, ch 113 [eff June 15, 2010]) requires the court deciding allegations of permanent neglect to "consider the special circumstances of an incarcerated parent." Circumstances to be considered include but are not limited to "particular constraints" such as "limitations placed on family contact and the unavailability of social or rehabilitative services to aid in the development of a meaningful relationship between the parent and his or her child, that may impact the parent's ability to . . . maintain contact with . . . and to plan for the future of his or her child." (*Id.*)[5]

---

**5.** The legislation also requires consideration of a parent's incarceration in the agency's decision whether to file a termination of parental rights petition based upon the length of the child's placement. In a new clause (D) under Social Services Law § 384-b (3) (*l*) (i), effective June 15, 2010, the Legislature admonished agencies to assess whether the incarcerated parent "maintains a

Here the agency regularly produced Alicia for visits with her mother. The father was incarcerated at some distance, and consequently the agency was not required to produce the child to Clinton Correctional Facility or to Southport. (Social Services Law § 384-b [7] [f] [5]; *Matter of Anastasia FF.* at 1186.) The agency kept in regular contact with the mother at the visits regarding Alicia's progress. The agency attempted to facilitate the father's plan for Alicia by meeting with his sister, granting her access to the child, and visiting her home. When the paternal aunt proved unable to plan, the father did not propose an alternative. Consequently, the court finds that the agency discharged its responsibility to both parents.[6]

The evidence clearly and convincingly establishes that the father had no plan for Alicia other than continued foster care for the duration of his incarceration. Given the duration of his incarceration, this constitutes a failure to plan. (*See e.g. Matter of Imani M.*, 61 AD3d 870 [2d Dept 2009]; *Matter of Lawrence KK. [Lawrence LL.]*, 72 AD3d 1233 [3d Dept 2010]; *Matter of Danyel Ramona C.*, 306 AD2d 127 [1st Dept 2003]; *Matter of Gregory B., supra.*)

In the mother's case, the evidence of failure to plan is not so clear or convincing. First, the agency never determined whether the mother was in continuing need of psychiatric or counseling

meaningful role in the child's life" based upon specific criteria. The legislative criteria include: the parent's acts or expressions manifesting concern for the child, such as letters, phone calls, visits and other forms of communication; efforts by the parent to communicate and work with the authorized agency, law guardian, foster parent, the court or others providing services to the parent, including correctional, mental health and substance abuse program personnel for the purpose of complying with the service plan and repairing, maintaining or building the parent-child relationship; a positive response by the parent to the agency's diligent efforts; and whether the parent's continued involvement in the child's life is in the child's best interests (Social Services Law § 384-b [3] [*l*] [v]). The Legislature directs the agency to consider opinions of those familiar with the parent and child, including the parent and child themselves, as well as foster parents and other significant figures in the child's life, and those providing services to the parent, including correctional, mental health and substance abuse treatment providers. The law guardian and even the parent's attorney are among those to be consulted.

6. It is not always easy to parse the issue of diligent efforts from the issue of the parent's adequate planning, as the extent of the parent's ability to plan toward reunification depends entirely upon the opportunities for planning provided by the agency (*see e.g. Matter of Shiann RR.*, 285 AD2d 762 [3d Dept 2001]; *Matter of Jamie M.*, 63 NY2d 388, 394 [1984] ["to fault parents for lack of cooperation presupposes that the agency has fulfilled . . . its own statutory obligations"]) or by the prison. (*Matter of Shi'ann FF.*, 47 AD3d 1133 [3d Dept 2008].)

services. While the agency may not be required to provide services or to arrange for services to be provided to an incarcerated parent, it is not onerous to place a burden on the agency to determine whether, in the assessment of the correctional authorities, the parent continues to need psychological or psychiatric services recommended by the agency. Here the unrebutted testimony of the mother is that her doctors agreed to discontinue medication and therapy. The burden is on the agency to prove otherwise. Nothing in the records of Bedford Hills proves the contrary. In fact, Ms. Muhammad testified that when she needed medication and therapy she requested and received those services from Bedford Hills. Second, while the agency must rely on the Department of Correctional Services to provide services to an incarcerated parent, the burden is on the agency to prove that the parent failed to cooperate with the services offered. Here Ms. Muhammad expressed to the prison counselors her intent to be reunited with the child. The prison records do not show any refusal to engage in offered services. (Cf. e.g. Matter of Shane I., 300 AD2d at 711.) She cooperated with the agency's scheduled visits. She completed one parenting skills course and enrolled in a second. There is no evidence that the agency asked the Department of Correctional Services to provide any additional services to Ms. Muhammad or that she was unreceptive to any agency suggestion. (See e.g. Matter of Shiann RR., 285 AD2d 762 [2001].) Third, while it is certainly true as a general proposition that incarcerated parents should attempt to acquire as early a release date as feasible for the sake of the child, there is no evidence that any disciplinary action taken against the mother will delay her release. It is also reasonable to expect an incarcerated parent to address the causes of their incarceration. (See e.g. Matter of Anastasia FF., 66 AD3d at 1186.) Ms. Muhammad had several infractions during the period in question, which led to her temporary removal from her GED, parenting and anger management programs. Of greater significance in the court's view is the mother's enrollment in such programs, which were intended to assist her to manage her anger, to obtain employment and to be a better parent. At the time the petition was filed, Ms. Muhammad was enrolled in therapy, taking medication, attending a GED program and attending a parenting at a distance program. The counselor noted that the mother acknowledged her need to improve her disciplinary record, and that her goal was to improve upon it. To impose on the mother a requirement that

she have no disciplinary action taken against her, would be to "set unrealistically high standards in evaluating a parent's planning efforts" under the circumstances.

Consequently, although the petitioner established permanent neglect as to the respondent father, Al G., the petitioner failed to establish permanent neglect as to the mother, Hanna Muhammad. The petition as to the mother is dismissed. The petition as to the father is adjourned to August 25, 2010 for disposition.